**Frank J. KELLEY; State of Michigan; Michigan Department of Natural Resources, Plaintiffs–Appellees,**

v.

**E.I. DuPONT DE NEMOURS AND COMPANY (92–2054); Browning–Ferris Industries, Inc. (92–2053), Defendants–Appellants,**

**Andrew Stevens, Defendant.**

Nos. 92–2053, 92–2054.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 1, 1993.

Decided Feb. 23, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied April 11, 1994.

A. Michael Leffler, Jeremy M. Firestone (argued and briefed), Office of Atty. Gen., Environmental Protection Div., Lansing, MI, for plaintiffs-appellees.

Cary Rodman Cooper, Cooper, Straub, Walinski & Cramer, Toledo, OH, William G. Beck (argued and briefed), Patrick J. Gregory, Lathrop & Norquist, Kansas City, MO, Jerry L. Anderson, Drake University Law School, Des Moines, IA, defendants-appellants.

Mark R. Haag (argued), Dept. of Justice, Environment & Natural Resource Div., Catherine M. Flanagan (briefed), U.S. Dept. of Justice, Washington, DC, for amicus curiae, U.S.

Before: KEITH, NELSON, and RYAN, Circuit Judges.

RYAN, Circuit Judge.

· The defendants, E.I. DuPont de Nemours and Co. and Browning–Ferris Industries, Inc., appeal the district court's award of summary judgment in favor of the State of Michigan, in the State's action to recover landfill cleanup costs pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, or CERCLA, 42 U.S.C. § 9601 *et seq.* On appeal, the defendants maintain that the State's CERCLA claim relating to physical removal costs is time barred. In addition, the defendants argue that equal protection and due process considerations preclude the State's recovery of these costs under the companion Michigan statute. Fi-

nally, the defendants claim that the district court lacked jurisdiction to enter a declaratory judgment for the State's future cleanup costs.

We conclude that the State's CERCLA action was timely as to all cleanup activity. Because the State is entitled to full cost recovery under CERCLA, the defendants concede that there is no need to reach the constitutional challenges to the Michigan statute. In addition, we conclude that there was a case or controversy of sufficient immediacy to warrant entry of a declaratory judgment in the State's favor.

## I.

Beginning in approximately 1955 and continuing over a ten-year period, defendant E.I. DuPont de Nemours and Co. disposed of large quantities of industrial waste at the Stevens Landfill in Bedford Township, Monroe County, Michigan. This waste, which included solvents, paint waste, paint thinner, lacquer, and sludge, was compartmentalized in open or sealed 55–gallon drums, or was hauled in liquid form and dumped over the 34–acre landfill. Community Sanitation Services, Inc., whose successor-in-interest is defendant Browning–Ferris Industries, transported the waste to the landfill from a DuPont facility in Toledo, Ohio.

There are approximately 5,700 residents in the area, and some 50 homes, as well as churches, schools, and a day care center in immediate proximity to the Stevens Landfill. Many of the residents closest to the landfill rely on groundwater for their domestic needs. After dumping at the landfill ceased in 1965, a number of local residents began using the area for hunting, off-road recreational vehicle riding, and other purposes.

In 1980, a local resident complained to the Michigan Department of Natural Resources that the Stevens site was littered with large barrels, possibly containing contaminated waste. Other residents found drums and bulked waste buried in pits. In addition, the landfill was the site of frequent fires, some explosive, and fire officials reported that many of these fires were self-starting.

Investigating these allegations, the Michigan Department of Natural Resources (MDNR), in conjunction with the U.S. Environmental Protection Agency, discovered the second worst site of environmental contamination in the state. The agencies found in excess of 1,000 drums. Many were leaking. An analysis of the drums' contents revealed ethylbenzene, naphthalene, and a number of other chemicals. A groundwater test detected the presence of pentachlorophenol, or PCP.

On June 27, 1984, pursuant to the Michigan Environmental Response Act, or MERA, the Michigan Legislature appropriated $1.38 million to clean up the Stevens Landfill. It took another year and judicial intervention before MDNR was able to gain access in June 1985. During this time, MDNR interviewed Stevens Landfill site owner Andrew Stevens, who informed MDNR of DuPont's and Community Sanitation's involvement in the dumping.

In October 1985, MDNR contracted with Hazardous Waste Technology Services, Inc., or Haztech, for the physical removal of the surface waste. Funding for this surface removal effort totalled almost half of the $1.38 million previously appropriated. About the same time, MDNR hired NUS Corporation to conduct a range of site evaluation activities, collectively known in the environmental arena as a Remedial Investigation/Feasibility Study, or RI/FS.

NUS began on-site activity in late October 1985 by conducting an overall site inspection, coupled with initial sampling of surface water, well water, and sediment. Soil gas surveying and other geophysical activity, along with ground water sampling followed on the heels of this preliminary activity. By January 1986, a joint team from NUS and MDNR was ready to conduct further geophysical tests to determine subsurface geological conditions.

In the meantime, Haztech began its physical removal efforts in November 1985. On several occasions in December 1985, Haztech conferred with MDNR over how to handle a pond located on the landfill site that contained bluish colored water. Haztech had removed several drums from the pond's sur-

face. Although some drum fragments were visible, Haztech had been unable to discern whether more waste lay under the pond's surface. Moreover, sludge and ice were hampering further removal efforts. MDNR called upon NUS to collect samples of the pond water and surface sludge, but there is no evidence that MDNR, Haztech, and NUS came to any agreement on how to handle the pond. In March 1986, MDNR announced to the public that Haztech had completed physical removal efforts. In total, Haztech had removed 1,150 drums and more than 2,600 cubic yards of contaminated soil.

In April 1986, NUS continued its RI/FS activities by conducting magnetometer and conductivity studies, in attempt to identify those areas where drums or other solid materials might have been buried. Shortly thereafter, NUS installed monitoring wells. Eventually, NUS identified ten sites, including the blue-water pond, that might house solid objects. The contractor excavated and sampled test pits at all sites in January 1987. Results from the tests revealed the presence of solid waste at only the blue-water pond location.

Following completion of the RI/FS draft reports in June 1987, MDNR hired Inland Waters to remove drums and related contamination from the blue-water pond site. Although Inland had worked as a Haztech subcontractor on the original physical removal contract, Inland had been the successful bidder against Haztech for this follow-up effort. Inland completed removal activity on July 15, 1987 by removing four drums and 1,150 cubic yards of contaminated soil, all from the blue-water pond area.

MDNR released the final RI/FS reports in late fall 1987, and, on March 3, 1988, announced that it had selected annual on- and off-site groundwater monitoring as its remedial plan. The agency expected monitoring to continue for 30 years, at an estimated total cost of $273,000. Sums already expended on the cleanup, including the RI/FS, exceeded $1.25 million.

In January 1989, after obtaining a state court order granting the necessary access, MDNR conducted its first annual off-site monitoring effort. Shortly thereafter, MDNR notified DuPont and Browning–Ferris that the State of Michigan considered the two companies liable for all cleanup and remedial costs. On July 12, 1990, the State filed a recovery action pursuant to CERCLA, seeking from DuPont, Browning–Ferris, and Andrew Stevens[1] full reimbursement of all sums expended and to be expended.

Upon cross-motions for summary judgment, the district court rejected the argument by DuPont and Browning–Ferris that the State's action was untimely as to the surface removal efforts. The defendants had maintained that Haztech's physical removal activity constituted a discrete removal action with its own attendant limitations period. In addition to finding that the State's CERCLA action was timely, the district court entered a declaratory judgment finding the defendants liable for the State's future costs 786 F.Supp. 1268. This appeal followed.

## II.

We review the district court's award of summary judgment _de novo_. _Pinney Dock & Transp. Co. v. Penn Cent. Corp._, 838 F.2d 1445, 1472 (6th Cir.), _cert. denied_, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). The Federal Rules of Civil Procedure require that summary judgment,

> be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In determining whether summary judgment is appropriate, the court must bear in mind that

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses ... to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate ... prior to trial, that the claims and defenses have no factual basis.

1. Stevens is not a party to this appeal.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Here, the district court, in granting summary judgment in the State's favor, correctly rejected the defendants' statute of limitations defense because there was no limitations deficiency as a matter of law.

### III.

■ The defendants concede that the State's federal law action to recover costs is timely as to the RI/FS activity undertaken by NUS. However, the defendants maintain that Haztech's surface removal was a discrete removal action that was completed in March 1986. Accordingly, argue the defendants, the State's 1990 action to recover surface removal costs is barred by the three-year statute of limitations governing CERCLA removal actions.

In this regard, the defendants first argue that the surface removal operation was an emergency physical removal action under CERCLA, and that such emergency actions proceed under different statutory and regulatory authority than do RI/FS actions. Second, the defendants claim that a 1987 agency directive expressly requires that an RI/FS action be treated as distinct from an emergency action. Finally, the defendants object to the district court's reliance on rules of statutory construction in reading the CERCLA statute of limitations.

Thus, the primary question here is exactly what constitutes a "removal action" under CERCLA. The statute explicitly categorizes actions to recover costs as either removal or remedial in nature, for statute of limitations purposes. The courts, and the parties here, agree that an RI/FS action is a type of removal activity. *See, e.g., General Elec. Co. v. Litton Indus. Automation Sys., Inc.,* 920 F.2d 1415, 1417–19 (8th Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991). The defendants, however, argue that RI/FS activity constitutes a distinct type of removal action that is separate from surface removal activity for all purposes, including statute of limitations calculations.

Like the district court below, the few courts that have considered similar arguments to date have found that surface removal activity and the RI/FS comprise a single removal action for statute of limitations purposes. For example, in *United States v. R.A. Corbett Transport, Inc.,* 785 F.Supp. 81 (E.D.Tex.1990), the court summarily found that CERCLA's statute of limitations did not bar a 1989 suit, even though physical removal activity was completed in 1984 and no RI/FS was undertaken until 1987. *Id.* at 82.

Here, the defendants maintain that the statutory and regulatory frameworks support their fine-line distinction. Their argument relies primarily on the statute's grant of authority to clean up what the defendants describe as "emergency physical removals," codified at 42 U.S.C. § 9604(a). The defendants emphasize that authority to conduct RI/FS activity is not covered by subsection 9604(a), but rather is codified in the succeeding subsection, at 42 U.S.C. § 9604(b). In addition, regulations governing emergency physical removals are found at 40 C.F.R. § 300.415, while the RI/FS regulations start at 40 C.F.R. § 300.430. Furthermore, emergency physical removals are "conducted by the Emergency Response Branch of the EPA [while] remedial investigation and feasibility stud[ies are] conducted by the Remedial Response Branch of the EPA." *United States v. Petersen Sand & Gravel, Inc.,* 824 F.Supp. 751, 753 n. 4 (N.D.Ill.1991). The premise of defendants' position, of course, is that Haztech's surface removal activity was an emergency physical removal under subsection 9604(a), but the RI/FS activity conducted by NUS was governed by subsection 9604(b).

CERCLA does not distinguish between physical removal actions and RI/FS activity as neatly as the defendants would like us to believe. It is true that the authority to conduct emergency physical removals is codified under a different subsection than is the authority to conduct evaluative activity. However, the authority granted under both subsections is inter-related, with subsection 9604(a) describing certain RI/FS procedures, and subsection 9604(b) contemplating that RI/FS activity will be warranted whenever physical removal is appropriate. The implication of this interplay is that Congress expected that both types of activity would be

taken in tandem "[w]henever ... any hazardous substance is released or there is a substantial threat of such a release into the environment...." 42 U.S.C. § 9604(a)(1).

Although the defendants find support for their position in the EPA's assignment of RI/FS responsibility to its Remedial Response Branch, while assigning responsibility for surface removals to another agency branch, the defendants cite no reason why this agency administrative organization scheme should be persuasive. Congress, not the EPA, enacted CERCLA, and there is no reason why the EPA's independent decisions on allocating workload should be construed to give meaning to statutory language. The defendants' reliance on the fact that agency regulations for RI/FS activity and physical removal activity are codified under separate subsection headings is without merit for the same reason.

The defendants next argue that the EPA, in acknowledging that RI/FS activity comprises a removal action, defined it as a separate and distinct action for statute of limitations purposes. The defendants rely on a 1987 "Timing of Cost Recovery" directive, which provides:

As a matter of policy, the Agency views completion of the removal action as the day the cleanup contractor demobilizes at the site and completes the scope of work identified in the original ... action memorandum.... Remedial investigations/feasibility studies (RI/FS) may fall within the statutory definition of removal action. *For purposes of cost recovery they should be treated as a separate removal action. Therefore, a cost recovery action should be commenced within three years of completing the original removal (exclusive of the RI/FS)....*

EPA Policy Directive 9832.9 (June 12, 1987) (emphasis added).

In contrast to this policy directive, current EPA policy, as evidenced in the agency's proposed rule, is to

define all pre-remedial action response action as removal actions and define the "completion of the removal action" for cost recovery purposes as the date of the last remedial design report ... preparatory to implementation of remedial construction activities at the site.

57 Fed.Reg. at 34751 (1992) (to be codified at 40 C.F.R. § 308.30(a)) (proposed Aug. 6, 1992).[2]

As with other executive agencies, the EPA's "interpretation of a statute which [it] administers" may be entitled to some deference. *American Academy of Ophthalmology, Inc. v. Sullivan,* 998 F.2d 377, 382 (6th Cir.1993). Where Congress implicitly has delegated to an agency the interpretation of a statutory issue, a regulation promulgated by the agency on that issue is entitled to "considerable weight." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Accordingly, provided the agency's interpretation of the statute is reasonable, the court may not substitute its own interpretation. *Id.* Moreover, "[t]he fact that the agency has from time to time changed its interpretation ... does not [require the court] to conclude that no deference should be accorded the agency's interpretation of the statute." *Id.* at 863, 104 S.Ct. at 2792.

The agency's policy statements and interpretative rulings, which, unlike agency regulations, are not published for comment and do not have to endure other rule-making formalities, still may be "give[n] ... considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Davis v. United States,* 495 U.S. 472, 484, 110 S.Ct. 2014, 2022, 109 L.Ed.2d 457 (1990). Other

**2.** The State, and the United States in *amicus curiae,* maintain that the proposed regulation, along with the express inclusion of "monitor[ing], assess[ing], and evaluat[ing,]" in the statutory definition of removal, *see* 42 U.S.C. § 9601(23), required a finding below that the removal action was not complete until the State selected long-term monitoring as its remedial plan. Under this interpretation, the date of completion would be in March 1988, rather than the July 15, 1987 completion date found by the district court. It is irrelevant to the statute of limitations question raised here whether the March 1988 or July 1987 date is correct, and, therefore, we do not address this issue.

factors that are important to the court's decision to adopt or reject agency policies include "the importance of agency expertise [and] the possibility of congressional acquiescence." *Johnson City Medical Ctr. v. United States,* 999 F.2d 973, 981 (6th Cir.1993) (Batchelder, J., dissenting).

The State and the defendants have presented conflicting agency interpretations delineating the phrase "completion of a removal action" for cost recovery purposes. The 1987 directive offered by the defendants is a policy statement, not a regulation. Accordingly, the primary factors affecting its weight are its proximity in time to enactment of the limitations period, and the length of time the EPA adhered to the policy. The directive, promulgated in 1987, was fairly contemporaneous with the 1986 enactment of the limitations period provisions. However, it is not entitled to deference because, *inter alia,* it was not in "long use," *see Davis,* 495 U.S. at 484, 110 S.Ct. at 2021, having been superseded by the agency's current proposed rule, which defines a removal action as *all* pre-remedial activity.[3]

Finally, the defendants argue that the district court improperly relied on rules of statutory construction in order to give CERCLA's limitations provision a liberal construction. Because the statute is unambiguous, claim the defendants, resort to construction methodology was unwarranted. Alternatively, provided the district court was correct in relying on rules of statutory construction, both the defendants and the State find support in the rules for their respective interpretations of the statutory limitations period.

■ A court's use of statutory construction rules is appropriate only "in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at

odds with the intentions of its drafters' ... or when the statutory language is ambiguous." *United States v. Steele,* 933 F.2d 1313, 1317 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991) (citations omitted). In all other instances, "[t]he plain meaning of the statute controls [the court's] interpretation...." *Id.*

The defendants maintain that the language chosen by Congress clearly shows that Congress contemplated that site cleanup could involve multiple removal actions, and that each such action should have its own limitations period. In setting the limitations period for removal activity, Congress provided that "a removal action [must be commenced] within 3 years after completion of the removal action." 42 U.S.C. § 9613(g)(2)(A).[4] The choice of words that so plainly demonstrates the defendants' position is Congress' identification of "*a* removal action" rather than "*all* removal actions" or even "[no modifier] removal action," as the point of departure for the limitations period. Ironically, the State identifies the same language as supporting its opposing position. Obviously if the meaning of the statutory language was as clear as either party maintains, the two sides could not have arrived at such contrary interpretations of it. Therefore, the district court looked properly beyond the plain meaning of the chosen words, to *indicia* of Congressional intent.

The defendants argue that, if resort to congressional intent is warranted, the district court should have construed the limitations provision so as to further the traditional objective of such provisions—limiting stale claims. The defendants maintain that a strict reading of the statute of limitations is especially compelled in CERCLA actions,

---

3. We decide here only that the 1987 directive is not entitled to any particular deference, given its informal nature and its short duration. We harbor the same concern enunciated in the concurring opinion that the 1992 proposed regulation may not warrant judicial deference as well. Accordingly, we rely on neither agency statement as the basis for our holding.

4. In addition, while Congress did not define the term "removal action" *per se,* it did define the term "removal," to include

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary ... to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment....

42 U.S.C. § 9601(23).

which tend to involve old facts as it is. Moreover, the defendants argue that the State's position is rife with the potential for abuse, in that all the State need do to revive an expired limitations period is to start new removal activity.

In support of their position, the defendants cite the legislative history of the CERCLA amendments that added the statute of limitations at issue. Specifically, the House Judiciary Committee Report explaining the amendment provided that, "in general [cost recovery and damages] actions should be brought as early as EPA has the necessary information to do so." H.R.Rep. No. 99–253(III), 99th Cong., 1st Sess., *reprinted in* 1986 U.S.C.C.A.N. 2835, 3038, 3043. In addition, the Supreme Court has recognized, on several occasions, that statutes of limitations are not disfavored, but rather " 'are found and approved in all systems of enlightened jurisprudence' [and] represent a pervasive legislative judgment that ... 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.' " *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979).

Conversely, this court has exhibited some willingness to give CERCLA provisions a broad construction, "consistent with the legislative purposes of the act." *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1247 (6th Cir.1991). There, the court concluded that a liberal reading of the term was warranted, in part, by the act's "two essential purposes," which were "to provide ... the tools immediately necessary for a swift and effective response to hazardous waste sites [and to ensure] that those responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created." *Id.* (citations omitted).

In addition, the First Circuit has acknowledged that CERCLA's limitations periods are to be broadly construed:

> The running of the statute of limitations is entirely within EPA's control.... [T]he government may take its own sweet time before suing, and ... the removal or remedial action may itself take years to complete....

*Reardon v. United States*, 947 F.2d 1509, 1519 (1st Cir.1991).

We conclude that Congress intended that the term "removal action" be given a broad interpretation. First, the statutory definition of "removal" is broad, and encompasses both physical removal and all RI/FS "monitor[ing], assess[ing], and evaluat[ing]" activities. 42 U.S.C. § 9601(23). The statute does not give a separate definition for "removal action." However, it is more reasonable to conclude that Congress perceived no need to define it, having defined removal, than it is to assume that Congress intended removal action to have some unique, but undefined, meaning.

Moreover, as this court has noted, CERCLA has two overriding objectives—cleaning up hazardous waste, and doing so at the expense of those who created it. It is simply inconsistent with these "essential purposes," *see Anspec*, 922 F.2d at 1247, to require suit on each arguably independent removal activity. Such a result could only be " 'demonstrably at odds with the intentions of [the statute's] drafters.' " *Steele*, 933 F.2d at 1317 (citations omitted).

The defendants' arguments to the contrary are unconvincing. Congress's choice of the modifying articles "a" and "the" to precede "removal action," *see* 42 U.S.C. § 9613(g)(2)(A), if it proves anything, proves that Congress intended that there generally will be only one removal action. The defendants' position identifies no logical stopping place. As an example, when we questioned the defendants during oral argument as to why the removal of each barrel would not constitute a separate removal action under their interpretation, they responded only that categorizing actions on a per barrel basis would be "breaking it down too far."

The defendants' claim that a strict reading of the statute of limitations is appropriate because this case involves old facts, is equally meritless, at least on the facts present here. The defendants' argument that the passage of time dims memories cuts against, rather than supports, their position. In general, the passage of an additional year will do little to

dim memories that are already almost 30 years old.

Moreover, while there may be cases where the EPA or a state might be tempted to revive a dead cause of action by instituting new removal activity, this clearly is not the case here. A single appropriations action provided funding for both the physical removal and the RI/FS. Both activities started within days of each other, and evidence abounds that the two activities were interdependent. Accordingly, the district court properly granted summary judgment in the State's favor.

The State raises an additional argument that the six-year statute of limitations found at 42 U.S.C. § 9613(g)(2)(B) should apply to the facts here, because the State initiated its monitoring plan within three years of completing the surface removal work. Section 9613(g)(2)(B) provides that removal action costs can be recovered under the longer limitations period, provided "remedial action is initiated within 3 years after the completion of the removal action." The State claims that its 30–year groundwater monitoring program falls within the statutory definition of remedial action, because it is "consistent with permanent remedy," it was "taken ... in addition to removal actions," and its purpose is "to prevent or minimize" the migration of the contamination. *See* 42 U.S.C. § 9601(24).

Because it is clear that the district court was correct in concluding that all of the State's removal activities comprised a single removal action, it is not necessary to reach this argument. However, it is reasonable to conclude that the State could have proceeded under CERCLA's alternative limitations period for remedial actions, having commenced its remedial monitoring activity within three years of the date Haztech pulled up stakes at the Stevens Landfill. *See* 42 U.S.C. § 9613(g)(2)(B).

### IV.

The defendants also claim that the district court erred in granting the State declaratory relief to cover future cleanup costs, because any such costs are speculative. The only foreseeable costs, according to the defendants, are the groundwater monitoring expenses and these have been liquidated pursuant to a settlement agreement. Therefore, say the defendants, there was no case or controversy before the district court.

■ We review the district court's entry of declaratory judgment *de novo. Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Ins. Co.,* 791 F.2d 460, 462 (6th Cir. 1986). In providing for the recovery of response costs, Congress included language to ensure that a responsible party's liability, once established, would not have to be relitigated:

> In any such action ... the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

42 U.S.C. § 9613(g)(2). The entry of declaratory judgment as to liability is mandatory. *United States v. Kramer,* 757 F.Supp. 397, 412 (D.N.J.1991). The fact that future costs are somewhat speculative is "no bar to a present declaration of liability." *United States v. Fairchild Indus., Inc.,* 766 F.Supp. 405, 415 (D.Md.1991).

The defendants argue that if Congress intended to mandate declaratory judgment, it exceeded its authority. The defendants base their position on what they discern as the absence of a case or controversy.

It is well-established that "the first requirement of justiciability is that a claim satisfy the 'case or controversy' requirement of Article III of the Constitution." *Michigan State Chamber of Commerce v. Austin,* 788 F.2d 1178, 1181 (6th Cir.1986). The case or controversy requirement is a limitation on Congress as well as on the judiciary. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Accordingly, Congress cannot create a right of action where no case or controversy otherwise exists.

■ Declaratory judgment actions present a unique challenge to the case or controversy requirement. In such a case,

> "[t]he question ... is whether the facts alleged, under all the circumstances, show

that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*Detroit, Toledo & Ironton R.R. Co. v. Consolidated Rail Corp.*, 767 F.2d 274, 279 (6th Cir.1985) (citation omitted). Accordingly, it is not essential that the threatened injury be absolutely "immediate" and "real." The potential for injury need only be "sufficient[ly] immedia[te] and real[ ]." *Id.* As another court has explained, a party seeking declaratory relief must allege facts to support a likelihood that his opponent's injurious "conduct has continued or will be repeated in the future." *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir.1985).

■ We conclude that the district court did not err in granting the State's request for declaratory relief. At the time of the district court's opinion, there was no agreement among the parties to liquidate the groundwater monitoring costs. As the State points out, this settlement agreement succeeded the trial court's determination by several months.

Moreover, the State has identified some additional future costs with certainty. For example, the present consent decree assures the State site access only through 1999. Already, the State twice has had to seek judicial intervention in order to enter the landfill. Therefore, it is probable that the State will incur costs to negotiate the further access necessary to adhere to its 30–year monitoring program. In addition, consistent with NUS's recommendations and with 42 U.S.C. § 9621(c), the State intends to conduct a five-year site review. The State also intends to seek reimbursement for the costs of this litigation.

Finally, the wide-ranging contamination that justifies CERCLA response actions such as that taken at Stevens Landfill makes it more certain than speculative that the State will have to expend resources in the future. For ten years, the defendants routinely dumped paint by-products and other toxic waste into the landfill. These chemical wastes seeped into the site over an additional 20 years before cleanup efforts began. As the State confirmed to the district court, extensive response measures, such as capping the entire landfill, would be necessary should groundwater monitoring reveal that the contamination has not been adequately contained. Given that the probability of subsequent activity in such instances is more likely than remote, it would waste State, corporate and judicial resources, and add immensely to the already "elephantine carcass of … CERCLA litigation" to require relitigation of liability whenever such subsequent response action is taken. *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 573 (6th Cir.1991). Should the defendants disagree that response was warranted or contest the measure of the response, the statute limits recoverable costs to those not inconsistent with the federal government's overall plan. *See* 42 U.S.C. § 9607(a)(4)(A); *Fairchild Indus.*, 766 F.Supp. at 415. Accordingly, the defendants are free to challenge the substance of any costs expended in the future.

### V.

The order of the district court is **AFFIRMED.**

DAVID A. NELSON, Circuit Judge, concurring.

I concur in the judgment and in all but Part III of the court's opinion. Like the opinion of the district court, Part III is too broad, in my view; I would allow recovery on a narrower ground.

The removal of waste-laden drums and contaminated soil from the Stevens Landfill constituted a single removal action, as I see it, notwithstanding that some of the material was removed by one contractor and some by another. Under the applicable statute of limitations, 42 U.S.C. § 9613(g)(2)(A), a cost-recovery suit may be brought within three years after completion of a removal action. Because this particular removal action was not completed until July 15, 1987, and because the state of Michigan commenced its lawsuit on July 12, 1990, the statute does not bar recovery of any of the costs associated with the removal action.

This conclusion would be inescapable, it seems to me, regardless of whether a Remedial Investigation/Feasibility Study ("RI/FS") had been conducted at the site and regardless of the timing of any such investigation/study. Under the interpretation that the United States Environmental Protection Agency placed on the statute of limitations within a year of the statute's enactment, a Remedial Investigation/Feasibility Study "should be treated as a separate removal action."[1]

A Remedial Investigation/Feasibility Study was conducted at the Stevens Landfill, of course, and it was not completed until November of 1987. The instant lawsuit having been filed on July 12, 1990, the defendants concede that the three-year statute of limitations does not bar recovery of the costs associated with the RI/FS. Indeed, as the defendants' brief tells us, all of such costs have been paid.

In a notice of proposed rulemaking published in August of 1992—almost six years after the enactment of 42 U.S.C. § 9613(g)— the U.S. EPA proposed a regulatory amendment reading, in part, as follows:

"For purposes of defining certain events that determine the statutory limitation periods applicable to cost-recovery actions pursuant to section 113(g)(2) of CERCLA [42 U.S.C. § 9613(g)(2) ], the following applies:

a. The term 'completion of the removal action' for sites where remedial actions are taken means the date of the final remedial design prepared in connection with the final remedial action at the site." 57 Fed. Reg. 34742, 34754 (August 6, 1992).

The preamble accompanying the proposed rule explains that there are different kinds of removal actions ("traditional physical removals," *e.g.*, as distinguished from "studies or investigations conducted under section 104(b) of CERCLA"), and the preamble notes that because "several of these removal actions may be taken simultaneously or in sequence at a site, the completion of the removal action for purposes of cost recovery may be difficult to ascertain." 57 Fed.Reg. at 34751. To circumvent this difficulty, the agency proposes to treat all removal actions at a given site as a single removal action that will be deemed incomplete until "the date of the last remedial design report prepared by EPA preparatory to implementation of remedial construction activities at the site." *Id.*

Whether the agency will actually adopt such a rule is unknown at this point. One factor militating against adoption, I should think, is the obvious difficulty of reconciling the language of the proposed rule with the language of the statute. To recover costs for "a removal action," as the statute says in the plainest of English, the plaintiff must commence suit within three years after "the removal action" has been completed. This means—if words have meaning—that suit must be commenced within three years after completion of the individual removal action the costs of which are sought to be recovered, not three years after the date of a remedial design report that may not be issued until long after completion of the removal action.

It bears emphasis that the preamble to the rule proposed in 1992 makes no attempt to back away from the proposition that the cleanup of a particular site may involve multiple removal actions. In addition to the material already referred to at 57 Fed.Reg. at 34751, see 57 Fed.Reg. at 34743:

"In order for EPA to undertake ['traditional' physical] removal actions and pay for them out of the Superfund, the action must cost less than $2 million and last less than one year, unless a waiver is granted pursuant to section 104(c)(1) of CERCLA. This statutory limitation does not apply to removal actions taken by responsible parties.

In addition to these 'traditional' physical removals, CERCLA's definition of removal

---

1. See Directive 9832.3, "Cost Recovery Actions/Statute of Limitations," issued on June 17, 1987, by the U.S. EPA's Office of Waste Programs Enforcement. The first of the stated purposes of this directive—a directive that superseded a memorandum issued prior to the October 1986 enactment of 42 U.S.C. § 9613(g)—was to "[u]pdate EPA's policy on timing of cost recovery action[s]." The update described the new statute in detail and reflected the agency's contemporaneous understanding of what the statute meant.

also includes certain other activities, including studies and investigations of releases and threats of releases to determine their nature and extent, and other actions taken to plan and direct response actions pursuant to section 104(b) of CERCLA."

Yet under the proposed rule, a $2 million physical removal action completed in 1987, for example, could be the subject of a cost-recovery suit commenced in 1992 or 1993 if the agency simply delayed long enough in issuing a final remedial design report. Such a result would be administratively convenient, no doubt, but I see nothing in the statute that could reasonably be construed as authorizing the agency to treat as incomplete a physical removal action that was, in fact, complete.

If the agency had read the statute this broadly from the beginning, I suppose the agency's interpretation might be entitled to some measure of deference. Administrative practice has "peculiar weight," as Mr. Justice Cardozo once said, "when it involves a *contemporaneous* construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (emphasis supplied).

When the 1986 statute was still "untried and new," however, the contemporaneous interpretation given it by EPA was diametrically opposed to the interpretation reflected in the 1992 proposed rule that the agency is now thinking about adopting. The latter interpretation is not final, it is not contemporaneous, and it is not compatible with the language of the statute. Accordingly, in my opinion, the rule of deference does not require us to follow it. See *Standard Oil Co. v. Dept. of Energy,* 596 F.2d 1029, 1056 (Em.App.1978):

> "Deference to an agency's 'interpretation' ... is not a hard and fast rule. The weight to be given to an administrative interpretation depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all

of those factors which give it power to persuade, if lacking power to control.' *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944)."

"An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987), citing *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981).

I am not persuaded that EPA's original reading of the statute of limitations was wrong, and I would decide this case in a manner consistent with the agency's original understanding.