**KENTUCKY HEARTWOOD, INC., et al., Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, et al., Defendants,**

and

**Pettit Wood Products, Inc., Intervenor–Defendant.**

**Civ. A. No. 95–225.**

United States District Court, E.D. Kentucky, Ashland.

Nov. 27, 1995.

Todd E. Leatherman, Reeves & Graddy, Lexington, KY, for Ky Heartwood Inc., Heartwood, Inc., Chris Schimmoeller, Bob House.

Jane E. Graham, U.S. Attorney's Office, Lexington, KY, Kelly E. Mofield, John W. Watts, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for United States Forest Service, Dan Glickman, James D. Manner, United States Fish and Wildlife Service, Bruce Babbitt, Lee Barclay.

Truman L. Dehner, John J. Ellis, Morehead, KY, for Pettit Wood Products, Inc.

HOOD, District Judge.

This matter is before the Court upon a number of pending motions: (1) the motion of the defendant the United States Forest Service, et al., for summary judgment [Record No. 14–1]; (2) the motion of the defendant the United States Fish & Wildlife Service to dismiss [Record No. 14–2]; (3) the motion of the plaintiffs Kentucky Heartwood, Inc., Heartwood, Inc., Chris Schimmoeller, and Bob House for summary judgment [Record No. 17]; and (4) the motion of the intervenor-defendant Pettit Wood Products, Inc. for summary judgment [Record No. 31].

Oral argument on these motions was heard by the Court on Friday, November 17, 1995. This matter is, therefore, ripe for decision.

## FACTUAL BACKGROUND

In May of 1995 a storm caused heavy and moderate damage to various portions of the Daniel Boone National Forest. After an informal analysis of the local timber market, the United States Forest Service (Forest Service) determined that a sale of this storm damaged timber would be appropriate. Following the decision to move forward with the proposed sale, the Forest Service sent out a "scoping notice" to interested members of the public including the plaintiffs and published such notice in the *Morehead News*.

In response to the notice, the plaintiffs raised the question of the impact of the proposed sale on the endangered Indiana Bat. On July 12, 1995, the Forest Service prepared a Biological Evaluation (BE) to analyze the project's potential effects on species listed under the Endangered Species Act (ESA), 16 U.S.C. Sections 1531 et seq., as either threatened or endangered species. The BE concluded that the proposed project was not likely to affect any threatened or endangered species.

With respect to the impact on the Indiana Bat in particular, the BE concluded that the project would "optimize the number of potential roosting and maternity trees that are available for use by the Indiana bat following the completion of salvage operations and should protect all actual and potential primary roost trees that are present in the salvage unit." (AR 23:07). The United States Fish & Wildlife Service (Fish & Wildlife) reviewed the BE and concurred in its conclusions.

Pursuant to the National Environmental Response Act, the Forest Service prepared an Environmental Assessment (EA) which examined the potential impact of the sale on soils, water resources, vegetation, wildlife, recreation, visual quality and cultural resources and human health. The EA was published on July 23, 1995, and public comment was solicited. At the same time, the Forest Service indicated that the sale would be handled as an emergency sale pursuant to 36 CFR § 215.10.

Upon learning that the Forest Service intended to invoke the emergency procedures under the NEPA, the plaintiffs faxed to all defendants a 60–Day Notice of Intent to file a Citizen's Suit pursuant to the Endangered Species Act. The plaintiffs made clear that they intended to challenge the 1995 Storm Salvage Timber Sale and another proposed sale at the Carrington Branch. The following day, the Fish & Wildlife Service withdrew its concurrence with the Carrington Branch Sale.

On September 12, 1995, the Forest Service announced that the timber sale would not be conducted in accordance with the requirements of NEPA or ESA but rather would proceed under the Salvage Timber rider to the 1995 Rescissions Bill, P.L. 104–19, Section 2001. Timber sales conducted pursuant to the Salvage Timber rider are exempt from these requirements.

On September 26, 1995, the first advertisement for the salvage sale appeared in the

newspaper. Within 15 days, the plaintiffs filed this action seeking declaratory and injunctive relief. In their amended complaint they contend that the defendants failed to comply with the 1995 Rescissions Bill and the Administrative Procedure Act, 5 U.S.C. § 702, in authorizing the 1995 Storm Salvage Timber Sale on the Morehead District of the Daniel Boone National Forest. The plaintiffs are particularly concerned with the impact of this sale on the Indiana Bat, an endangered species.

## DISCUSSION

### A. Whether the Challenged Project involved a Salvage Timber Sale which may be Conducted pursuant to the Salvage Timber rider of the 1995 Rescissions Act

■ At the outset, it must be determined whether the sale in question may be conducted under the Emergency Salvage Timber Sale Program enacted as the Salvage Timber rider Section 2001 of the 1995 Rescissions Act. This threshold determination is quite significant as the following limitations apply to judicial review of such sales: (1) review is based on the administrative record only; (2) the standard of review is arbitrary and capricious or otherwise not in accordance with applicable law; and (3) the sale is not subject to any federal environmental or natural resources laws.

This last limitation is crucial. As Congress is the one that created all of the federal environmental laws, it is clearly within its power to exempt certain activities from those laws as it has done here. The sale must, however, comply with the documents and procedures called for in the 1995 Rescissions Act.

The plaintiffs maintain that the Forest Service acted erroneously when it changed the status of the sale from a normal salvage sale to a sale under the Salvage Timber rider. The plaintiffs contend that there is some sort of cut off date intended by the timber sale rider. Further, from certain language in the statute which refers to reducing the backlog of salvage sales, the plaintiffs reason that sales may be made under this provision only for timber that was damaged before April 25, 1995, and only where there is some level of backlogged salvage timber not specified in the statute.[1] In short, the plaintiffs contend that Congress did not intend for the rider provision to apply to the instant sale.

As the Forest Service has failed to quantify the backlog in the sale area in the Administrative Record, according to the plaintiffs it is impossible for there to be any proper foundation upon which this sale might proceed under the Salvage Timber rider. Accordingly, the plaintiffs maintain that the instant sale may only proceed as a normal salvage sale.

The Forest Service, on the other hand, disputes such a reading of the Timber Salvage rider. They contend that there is nothing in the definitional section of the provision which even hints at there being some sort of requirement that there be a backlog volume of timber in order for a sale to proceed under the rider. The Forest Service further points out that the plaintiffs' reference to a backlogged volume of timber is traceable to a provision which merely urges the Secretary "to achieve, to the maximum extent feasible, a salvage timber sale volume level above the programmed level to reduce the backlogged volume of salvage timber." Accordingly, the Forest Service maintains that the instant sale falls within the provision.

The intervenor-defendant Pettit Woods Products, Inc. argues that it would be absurd for the provision to apply to certain trees or areas that were damaged on a certain date but not to others that were damaged on a later date. Pettit Woods asks whether it is really the clear intent of the statute to have the applicability of this provision turn on when the damage occurred.

The Court agrees with the Forest Service's reading of the Salvage Timber rider and finds that the instant sale may be conducted in conformance therewith. It is true that the

1. Subsection (b)(1) of the Salvage Timber rider provides: "During the emergency period, the Secretary concerned is to achieve, to the maximum extent feasible, a salvage timber sale volume level above the programmed level to reduce the backlogged volume of salvage timber."

general purpose of the rider may at least in part be to reduce a backlog of salvage timber. However, there is no limitation in the plain language of the statute which would limit salvage sales to those that were part of a backlog existing at the time Congressional committees issued reports in April 1995.[2] The only time limitations on these sorts of sales relate to (1) the December 31, 1996, expiration of the authority to conduct such a sale[3] and (2) the requirement that the sale be advertised, offered and awarded within the emergency period which runs from July 27, 1995 to September 30, 1997.[4] Both of these time constraints are satisfied in the instant sale.

 Most telling is the statutory definition of "salvage timber sale" which contains absolutely no requirement of a specified backlog. This definition reads:

> The term "salvage timber sale" means a timber sale for which an important reason for entry includes the removal of disease- or insect-infested trees, dead, **damaged or downed trees,** or trees affected by fire or imminently susceptible to fire or insect attack. Such term also includes the removal of associated trees or trees lacking the characteristics of a healthy and viable ecosystem for the purpose of ecosystem improvement or rehabilitation, except that any such sale must include an identifiable salvage component of trees described in the first sentence.

Section 2001(a)(3) (emphasis added). The Court declines to add additional requirements which are not clearly called for by the plain language of the statute and, further, are not plausible inferences reflecting the intent of Congress. That the plain meaning of a statute controls a court's interpretation is the rule, not the exception. *Kelley v. E.I. DuPont de Nemours and Co.,* 17 F.3d 836, 842 (6th Cir.1994). As the sale at issue involves entry an important reason for which is the removal of "damaged or downed trees"

and the sale was conducted during the specified statutory period, the sale at issue properly proceeded under the Salvage Timber rider of the 1995 Rescissions Act.

Accordingly, the motion of the plaintiffs for summary judgment on this Count of the amended complaint must be denied and the corresponding motions for summary judgment by the defendants and intervenor-defendant must be granted.

**B. Whether the Decision to Proceed with the Timber Sale was Arbitrary and Capricious**

 There is no dispute as to the standard of review applicable to the decision to proceed with the timber sale under the Salvage Timber rider. Section 2001(f)(4) sets out the parameters of this review. First, the Court is only to examine the administrative record.[5] Second, the Court reviews the decision to determine only whether it was "arbitrary and capricious or otherwise not consistent with applicable law." Finally, the Salvage Timber rider exempts sales made under this provision from all federal environmental and natural resource laws including the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., and the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq.

Accordingly, the Court will review the decision of the Forest Service to proceed with the salvage timber sale under this limited standard of review.

**1. Decision Documents Authorizing the Sale**

According to one of the counsel for the plaintiffs, the "guts of this case" centers on a statement contained in the EA created by the Forest Service. That statement reads: "[t]he adoption of these [mitigation] measures should optimize the number of potential roosting and maternity trees that are available for use by the Indiana bat following completion of salvage operations and should

---

**2.** Moreover, the May 1995 storm which resulted in the forest damage predates the enactment of the Rescissions Act on July 27, 1995.

**3.** Section 2001(j).

**4.** Sections 2001(b)(1) and 2001(a)(4).

**5.** This principle served as the rationale for granting in part the plaintiffs' motion to strike certain affidavits which injected post hoc rationalizations into the decision process.

protect all actual and potential primary roost trees that are present in salvage units." (AR 28–50). Citing a number of different studies, including one by Russell C. Romme and others, the plaintiffs contend that this statement is incorrect and misleading. They maintain that this representation is inconsistent with the Romme study in that it will not create suitable habitats nor will it optimize the same. The Forest Service, on the other hand, maintains that the six mitigation measures adopted are consistent with the studies in this area which will serve to optimize the Indiana bat's potential roosting sites within the context of a timber sale.

It is clear that pursuant to the Rescissions Act the "scope and content" of the EAs and BEs prepared are left to the "sole discretion" of the Secretary. Section 2001(c)(1)(C). In this matter, the Secretary elected to include certain statements concerning the mitigation measures to be implemented to protect the roosting sites in the sale area. These mitigation measures are as follows:

1) preserving summer habitat favored by the Indiana bats in each salvage unit, notably a certain density of snags; 2) preserving live trees of a certain size as a preferred fall-back option, for portions of sale units where there are insufficient snags; 3) leaving slightly smaller trees and snags as a second fall-back option, based on stands from the literature; 4) prioritizing tree species for preservation based on standards from the literature; 5) preserving all shagbark hickories, a preferred roosting habitat for the bat; 6) closing access roads upon completion of salvage activities to improve bat habitat.

(AR at 22:01; 28:04; 51:04).

Having considered the arguments presented in the briefs and at the hearing, the Court concludes that the mitigation measures and the statements associated therewith do not render the decision arbitrary and capricious. Each of the six mitigation factors is consistent with Romme's survey of the various studies concerning Indiana bat habitat in so far as the teachings of those studies are applicable to the sale in question.

The Romme study recommends six snags per acre as optimal; the Forest Service's plan includes at least this number. Although cutting trees next to maternity roosts will increase exposure to sunlight, Romme's survey suggests that some exposure to sunlight may have a positive effect on bat habitat. The current plan is designed to preserve a sufficient number of roost trees which, consistent with the Romme survey, is more important than retaining each and every roost tree. Any severely damaged shagbark hickories will be left as this is the species preferred by the Indiana bat.

Moreover, the Romme study itself is intended to be applied flexibly. Its suitability index was not designed for storm damaged areas such as the one at issue here and the index itself expresses caution about widespread application. This point is most apparent when considering the optimal overstory requirements. As this sale involves only "down, uprooted, and severely damaged trees from selected stands," the applicability of this requirement is minimal at best.

All of this goes to show that in the context of the salvage timber sale following a storm which surely damaged the Indiana bat's habitat, the Forest Service has built in certain measures consistent with the literature to protect the Indiana bat. If the Indiana bat were the only factor to be considered it might be preferable to have no sale at all. Such is not the case, however, and having reviewed all of the factors the Forest Service has determined that a salvage sale would be appropriate.

Given the extremely deferential standard of review a court must apply to a decision under the Salvage Timber rider, a challenger must go a long way to have a decision overturned. There is no question as to the Forest Service's consideration of the relevant factors. Rather, the plaintiffs contend that the mitigation factors evince a "clear error of judgment" with respect to the impact on the Indiana bat. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). In this Court's estimation, the Forest Service's adoption of these mitigation factors and the statements concerning those factors are far from evincing a clear error of judgment. On

the contrary, the Forest Service has chosen to take steps to protect the Indiana bat where such steps are not required.

## 2. Comparison to the Carrington Branch Sale

In addition to this statement, the plaintiffs contend that the instant sale is arbitrary and capricious due to the fact that the Forest Service is not providing the same protections to the Indiana bat that it provided in a sale at the Carrington Branch. It is undisputed that there are two known Indiana bat maternity colonies in the Daniel Boone National Forest, one in the vicinity of the instant sale and another at the Carrington Branch. After initially deciding to proceed with the Carrington Branch sale, the Forest Service determined that the Indiana bat would not be adequately protected and so it withdrew the decision to proceed with the sale.

Simply put, the Court finds the plaintiffs argument in this respect unpersuasive. Setting aside an initial question of whether it would even be appropriate for the Court to delve into the Carrington Branch sale, the Court concludes that certain factors distinguish the Carrington Branch sale. First and foremost, the instant sale involves a salvage sale. The Carrington Branch sale, on the other hand, involved a live tree sale. This distinction alone renders specious any argument that the Forest Service must somehow defend its decision on one sale against a different decision in another.

Second, it is uncontroverted that a study as thorough as the one conducted in the instant sale was not conducted at the Carrington Branch. In the instant sale, radio tracking devices, misting, and field survey were used to assess the nature of the Indiana bat presence. Moreover, the Carrington Branch sale was examined before the Romme study became available. Finally, according to the Forest Service, the instant sale was significantly more protective of the Indiana bat habitat overall. Although the plaintiffs dispute this point, the Court finds that the mitigation measures taken at the instant sale by the Forest Service are significant protections particularly bearing in mind that the Forest Service was under no obligation to establish any procedures to mitigate the effects of the harvest on the Indiana bat.

Considering all these factors, comparison to the Carrington Branch sale does not render the instant sale arbitrary and capricious.

## CONCLUSION

It is significant to note that one of plaintiffs' counsel concedes that Congress has bestowed upon the Secretary of Agriculture acting for the Forest Service the discretion and authority to harvest certain timber (which falls within the purview of the Salvage Timber rider) regardless of any environmental statutes. That is to say, if the Forest Service correctly determines that a certain sale may be conducted under the Salvage Timber rider, that sale may proceed even if it has a detrimental impact on an endangered or threatened species such as the Indiana bat. As Congress is the fountainhead for all federal environmental and natural resources laws, it clearly has the power to create blanket exemptions from those same laws. Although the wisdom of such exemptions might be debated, the authority to so exempt is incontrovertible.

As the Forest Service would be free to proceed with this sale regardless of the impact on the Indiana bat, it appears to the Court that the Forest Service is actually going above and beyond the call in implementing the six mitigation factors designed to protect the Indiana bat. In light of the entire administrative record, the Court concludes that the decision of the Forest Service (including the mitigation measures to be implemented) was not arbitrary and capricious or otherwise inconsistent with applicable law.

Accordingly,

**IT IS ORDERED HEREIN:**

(1) That the motion of the plaintiffs for summary judgment [Record No. 17] be, and the same hereby is, **DENIED.**

(2) That the motions of the defendants and the intervenor-defendant for summary judgment [Record Nos. 14, 31] be, and the same hereby are, **GRANTED.**

(3) That this matter be, and the same hereby is, **DISMISSED** and **STRICKEN FROM THE ACTIVE DOCKET.**

(4) That this Order is **FINAL AND APPEALABLE** and **THERE IS NO JUST CAUSE FOR DELAY.**

(5) That all other pending motions be, and the same hereby are, **DENIED AS MOOT.**