UNITED STATES of America, Plaintiff,

v.

POLY–CARB, INC., Montana Refining Company, and C. Michael Wilwerding, Defendants.

No. CV–N–91–360–ECR.

United States District Court, D. Nevada.

Dec. 3, 1996.

Lois J. Schiffer, Asst. Attorney General, Environment & Natural Resources Div., T. Anthony Quinn, James A. Lofton, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, D.C. and Kathryn E. Landreth, U.S. Attorney for the District of Nevada, Shirley Smith, Asst. U.S. Attorney in Charge, Reno, NV, for Plaintiff.

Michael G. Thornton, Kurt W. Melchior, Joseph M. Keene, Nossaman, Buthner, Knox & Ellio, San Francisco, CA, and Robert F. Saint–Aubin of Maddox & Saint–Aubin, Reno, NV, for Defendants.

## ORDER

EDWARD C. REED, Jr., District Judge.

The United States of America ("Plaintiff") (Doc. # 88) and Montana Refining Company ("Defendant") (Doc. # 90) have renewed their motions for summary judgment in this action brought under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601–9675 ("CERCLA"). Because we find that there exist several genuine issues of material fact regarding liability, and that no reasonable jury could find for Defendant as to all other material facts bearing on liability, we DENY Defendant's renewed summary judgment motion (Doc. # 90) and GRANT IN PART Plaintiff's renewed summary judgment motion (Doc. # 88).

## BACKGROUND

Poly–Carb, Inc. set up a chemical processing plant ("Poly–Carb Site") in Wells, Nevada, and in late 1984 received about 9000 gallons of a material known as "phenolic caustic" ("caustic") from Montana Refining Company of Great Falls, Montana. EPA Report at 1 (Doc. # 33, Ex. A, Att. 1). This caustic contained, among other things, "phenols" and "cresols," which are hazardous substances as defined by EPA hazardous waste regulations. *Id.* at 1–2. On May 27, 1985 approximately 8000 gallons of caustic spilled from a holding tank on the Poly–Carb Site and contaminated about 300 cubic yards of nearby soil. *Id.* at 1. This spill may have been the work of vandals. *Id.*

In 1986 the U.S. Environmental Protection Agency ("EPA") began its clean-up effort, technically known as a "removal" action, which continued until August 1988. *Id.* at 16–20. Pursuant to 42 U.S.C. § 9607(a)(4)(A), the United States ("Plaintiff") filed suit August 15, 1991 against Poly–Carb, Inc. as owner of the Site, C. Michael Wilwerding as president of Poly–Carb, and Montana Refining Company ("MRC" and "Defendant") as arranger of the shipment of caustic to Wells, Nevada. Complaint (Doc. # 1). February 24, 1993, default was entered against Poly–Carb and C. Michael Wilwerding, leaving MRC as the only defendant in the action. Docs. # 52 & 53.

MRC and Plaintiff filed cross-motions for summary judgment in September, 1992. Docs. # 33 & 34. This Court entered judgment in favor of Defendant on June 11, 1993, appeal was taken, and on August 17, 1994 the Ninth Circuit Court of Appeals vacated our summary judgment and remanded the case to this Court. Judgment (Doc. # 59); Appellate Memorandum (Doc. # 65). The parties have since renewed their motions for summary judgment and these motions (Docs. # 88 & 90) are now ripe.

## DISCUSSION

### I. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed. R.Civ.P. 56(c); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). Where reasonable minds could differ on the material facts at

issue, summary judgment is not appropriate. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.*

## II. Standard of Proof

■ A CERCLA plaintiff must prove, at minimum, four elements. First, that the waste disposal site is a "facility" within the meaning of 42 U.S.C. § 9601(9). *Cose v. Getty Oil Company,* 4 F.3d 700, 703 (9th Cir.1993). Second, that a "release" or "threatened release" of a "hazardous substance" from the facility has occurred. *Id.* Third, that such release required the expenditure of response costs that are "consistent with the national contingency plan." *Id.* at 703–04. Fourth, that the defendant falls within one of the four classes of persons subject to CERCLA liability. *Id.* at 704. A defendant may defeat liability by proof of an affirmative defense, including a defense listed in 42 U.S.C. § 9607(b). We review the elements and defenses in turn.

## III. The Material Facts

### A. The Poly–Carb Site was a "Facility"

■ Under 42 U.S.C. § 9607(a)(3), "any person who ... arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any *facility*" shall be liable (emphasis added). A facility includes, among other things, "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed." 42 U.S.C. § 9601(9). Defendant disputes that the Poly–Carb Site was a "facility" within this definition on the grounds that 1) the caustic was not a "hazardous substance" being disposed of or treated within the statute's meaning (Def.'s Summ.J.Mot. at 10–23 (Doc. # 90)), and 2) Plaintiff has failed to bring forth evidence showing that Defendant's caustic, which Defendant admits it delivered to a facility run by BriCo, was the same material spilled at the Poly–Carb facility (Def.'s Summ.J.Mot. at 7–10 (Doc. # 90)).[1] The first ground we address below in Part III.D; the second ground is unconvincing.

Indeed, this Court confesses to some surprise at Defendant's refusal to concede this point. *E.g.,* Def.'s Reply at 2 (Doc. # 100); Def.'s Resp. at 2–4 (Doc. # 109). Defendant admits that it shipped about 7,000 gallons of caustic to Wells, Nevada, for use at Poly–Carb's "facility." Def.'s Undisputed Facts at ¶¶ 5, 8 (Doc. # 91). It is true that precisely how and when the caustic got from the BriCo facility to the Poly–Carb Site is still murky.

---

**1.** Defendant does not explicitly characterize this argument as one challenging the "facility" evi-dentiary element, but we will construe it as such anyway.

Def.'s Resp. at 2–4 (Doc. # 109). But the who, what, why, and where are not in dispute. Def.'s Reply (Doc. # 108). Michael Wilwerding stated unequivocally that "Poly–Carb did not obtain spent caustic from any source other than Montana Refining Company." Wilwerding Decl. at ¶ 14 (Doc. # 97, Ex. A); *see also* Wilwerding Supp.Decl. at ¶ 9 (Doc. # 114). That Plaintiff's evidence is weak and confusing as to when and how the caustic was delivered to the Poly–Carb Site does not mean that the delivery never happened. No genuine issue of material fact exists regarding Defendant's "arrange[ment] with a transporter for transport . . . of [caustic] owned or possessed by [Defendant], . . . [to] any facility . . . containing such [caustic] . . . from which there [was] a release." 42 U.S.C. § 9607(a)(3)–(4).

### B. Release of a Hazardous Substance

■ We are even more surprised by Defendant's argument that no release occurred, since caustic was unquestionably spilled at the Poly–Carb Site. Wilwerding Supp.Decl. at ¶ 9 (Doc. # 114); Wilwerding Decl. at ¶¶ 14–16 (Doc. # 97, Ex. A). Defendant challenges the existence of this release on the grounds that the EPA On–Site Coordinator did not find any "phenolic caustic" during the removal process. Def.'s Reply at ¶ 51 (Doc. # 108). It is true that the only hazardous substances found during cleanup were "phenols" and "cresols," but the evidence is overwhelming that MRC's spilled phenolic caustic was the source of those chemicals.[2] Mandel Decl. at ¶ 8 (Doc. # 33, Ex. A); Wilwerding Decl. at ¶¶ 14–16 (Doc. # 97, Ex. A). No reasonable jury could find otherwise.

Whether the caustic was a "hazardous substance" within the ambit of CERCLA arranger liability is a closer question, which we address below in Part III.D. However, Defendant's only dispute with respect to this issue is its claim that caustic falls within the petroleum exclusion; it is otherwise undisputed that phenols and cresols are hazardous substances with the meaning of CERCLA. Def.'s Summ.J.Mot. at 18–23 (Doc. # 90);

Mandel Decl. at ¶ 10 (Doc. # 33, Ex. A). Hence, our resolution of the petroleum exclusion and reclamation questions also resolves the hazardous substance question.

### C. Plaintiff Incurred Response Costs

Defendant does not dispute that the United States incurred response costs within the meaning of 42 U.S.C. § 9601(25). Def.'s Reply at ¶¶ 52–53 (Doc. # 108). We therefore find that Plaintiff incurred response costs within the meaning of § 9607(a), as well.

### D. Defendant's Arranger Liability

■ Plaintiff's case is predicated on what is known as "arranger liability." *U.S. v. Iron Mountain Mines, Inc.,* 881 F.Supp. 1432, 1451 (E.D.Cal.1995). "Arrangers" are one of the four classes of liable parties under 42 U.S.C. § 9607(a), and liability may be found even after the arranger transferred title to, and control over, the hazardous substance. *Id.; Catellus Development Corp. v. U.S.,* 34 F.3d 748, 752–53 (9th Cir.1994). Defendant challenges Plaintiff's case on a variety of grounds, all of which center on the nature, purpose, and use of phenolic caustic. However, our consideration of the merits of these challenges is circumscribed by the mandate of the Court of Appeals.

#### 1. *Poly–Carb I*

■ The doctrine of the law of the case limits our reconsideration only of those issues previously determined. *Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979). On remand, the " '[District] Court may consider and decide any matters left open by the mandate of [the appellate] court.' " *Id.* (quoting *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895)). That is, " 'a mandate is controlling as to all matters within its compass, while leaving any issue not expressly or impliedly disposed of on appeal available for consideration by the trial court on remand.' " *Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1497 (9th Cir.

---

**2.** Indeed, we question whether, in light of *Cadillac Fairview/California, Inc. v. U.S.,* 41 F.3d 562, 565 (9th Cir.1994), proof that *MRC's* caustic was spilled at the Poly–Carb Site is even necessary to find liability in this case.

1995) (quoting *Firth v. U.S.*, 554 F.2d 990, 993 (9th Cir.1977)).

■ Plainly, the three elements of Plaintiff's case which we examine above are not within the appellate court's mandate, since the only issue on appeal in *Poly–Carb I* was our resolution of this, the fourth element. Order (Doc. # 49); Appellate Memorandum (Doc. # 65). What is less plain is how much latitude this Court possesses (in *Poly–Carb II*) to consider the fourth element. Specifically, is consideration of, say, the CERCLA petroleum exclusion foreclosed by the Ninth Circuit mandate?

We approach this problem by breaking the issues down into discrete arguments. In *Poly–Carb I*, Defendant argued that its caustic was not a waste, that it did not arrange for "disposal or treatment" of the caustic, that CERCLA's petroleum exclusion precludes liability, and that certain affirmative defenses applied. Def.'s Summ.J.Mot. (Doc. # 34); Def.'s Opp'n (Doc. # 39). Plaintiff, naturally, countered all these arguments. Pl.'s Opp'n (Doc. # 37); Pl.'s Reply (Doc. # 43). We rested our disposition of the original summary judgment motions on a combination of the first and second of these points. Order at 7–8 (Doc. # 49). We held that "no evidence shows that the phenolic caustic sold to Poly–Carb by MRC was waste; ... MRC sold its phenolic caustic to Poly–Carb so that it could be put to productive use" and not so that is could be "disposed of." *Id.* at 8. We did not address the petroleum exclusion question or affirmative defenses.

The Ninth Circuit approved of this part of our approach—that is, our determination that only "waste" is subject to "disposal or treatment"—but disapproved of our failure to look to EPA regulations for further guidance. Appellate Memorandum at 2 (Doc. # 65). The Court then made this observation: "The

main issue here is whether the phenolic caustic, which is being used as an ingredient in an industrial process to make a product, is being reclaimed." *Id.* (citing 40 C.F.R. § 261.2(e)). Although we did not make any *explicit* factual finding that the caustic was "being used as an ingredient in an industrial process," the Court's almost verbatim employment of the language of 40 C.F.R. § 261.2(e) indicates an intent to limit, on remand, our weighing of the "waste" and "disposal or treatment" arguments to deciding whether the caustic was "being reclaimed." *Id.* At the same time, however, our overlooking of the petroleum exclusion argument and Defendant's affirmative defenses in *Poly–Carb I* should not, and does not, foreclose our current consideration of them (and of the arguments raised for the first time in *Poly–Carb II*), since the Ninth Circuit necessarily overlooked these arguments. *See Odima*, 53 F.3d at 1497.

### 2. *Poly–Carb II*

Both sides have renewed all the arguments they raised in *Poly–Carb I*. Def.'s Summ. J.Mot. at 2 (Doc. # 90); Pl.'s Opp'n at 2 (Doc. # 93). Defendant's points are thus 1) the petroleum exclusion bars liability (Doc. # 90 at 18), 2) the caustic is a "by-product" that is not waste even if reclaimed (*id.* at 17), 3) the caustic was not sold for reclamation (*id.* at 11), and 4) MRC did not "arrange for disposal" of its caustic (*id.* at 10). The first and second points are sufficiently distant from the Ninth Circuit's mandate for us to consider them here, the third point is exactly what the Ninth Circuit directed us to consider, and the fourth point is foreclosed.[3] Plaintiff's points include 1) the petroleum exclusion does not apply (Doc. # 93 at 11), 2) the caustic is a "spent" material rather than a "by-product" (*id.* at 11; Doc. # 89 at 8, 14), and 3) Poly–Carb's caustic processing constituted reclamation (Doc. # 89 at 11). These points attempt to directly rebut Defendant's

---

**3.** Specifically, Defendant contends that our previous factual observations about the foreseeability of spillage, productiveness, and ownership of the caustic are sufficient to negate any charge that MRC "arranged for disposal" of waste. Def's Summ.J.Mot. at 10–11 (Doc. # 90). This contention is without merit. The Ninth Circuit clearly held that our *Poly–Carb I* Order should have looked to EPA regulations and not just to plain English in determining whether the caustic

was discarded waste. Appellate Memorandum at 2 (Doc. # 65). Furthermore, the Ninth Circuit's teachings in *Catellus*, and the *very* broad language of 42 U.S.C. § 6903(3) (defining "disposal"), clearly indicate that whether Defendant "arranged for disposal" turns entirely on whether the caustic can legitimately be characterized as "solid waste." In other words, our resolution of Defendant's second and third points also resolves Defendant's fourth point.

points (except its fourth point) and are similarly addressable under the Ninth Circuit's mandate. Consequently, the three issues we must address under the fourth evidentiary element are: whether the petroleum exclusion applies, whether the caustic was being reclaimed, and whether it was waste even if reclaimed.[4]

### a. Petroleum Exclusion

■■■ Under 42 U.S.C. § 9601(14), "hazardous substance" "does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance." Neither party contends that caustic is "crude oil." *But see* Miller Letter (Doc. # 33, Ex. I) (noting the presence of "fuel oil" in caustic). As a result, if caustic is a fraction not otherwise listed, then the petroleum exclusion applies. We must therefore determine whether caustic is "petroleum" or a "fraction of crude oil."

Congress has left us bereft of guidance— CERCLA defines neither "petroleum" nor "fraction." *Wilshire Westwood Assoc. v. Atlantic Richfield,* 881 F.2d 801, 803 (9th Cir. 1989). No reported cases have addressed this precise question. CERCLA's legislative history is of little help. The only Ninth Circuit cases on this issue are *Cose* and *Wilshire,* which apparently endorse a holistic approach to an inquiry such as this. Specifically, the *Wilshire* court weighed the statute's plain language and legislative history, as well as EPA interpretations, to conclude that gasoline with a hazardous additive (i.e., lead) is excluded from CERCLA, and the *Cose* court weighed the statute's plain language and legislative history, and non-binding precedent, to conclude that crude oil tank bottoms containing a hazardous substance is not excluded.[5]

■■■■ We begin by applying the statutory language to the facts, since the starting point for statutory interpretation is the language of the statute itself. *U.S. v. Gomez–Rodriguez,* 96 F.3d 1262, 1264 (9th Cir.1996). If the plain meaning of a statute is clear, we must give effect to the unambiguously expressed intent of Congress. *Id.* Unless otherwise defined, statutory words should be interpreted as taking their ordinary, contemporary, common meaning. *Wilshire,* 881 F.2d at 803–04 (citing *Perrin v. U.S.,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)).

Although this is arguably a question of first impression, the Ninth Circuit has commented on § 9601(14) in two ways germane to our interpretation. First, in *Wilshire* and again in *Cose,* the Ninth Circuit defined "fraction" as "one of several portions (as of a distillate or precipitate) separable by fractionation and consisting either of mixtures or pure chemical compounds." *Wilshire,* 881 F.2d at 803 (citing *Webster's Third New International Dictionary Unabridged* (1981)); *Cose,* 4 F.3d at 705. The Ninth Circuit also took judicial notice of the definition of petroleum, again citing the dictionary: "Petroleum" is, in part, an "oily flammable bituminous liquid ... that is subjected to various refining processes ... for producing useful products." *Wilshire,* 881 F.2d at 803; *Cose,* 4 F.3d at 705 (emphasis omitted). In other words, whether caustic is petroleum or a fraction of crude oil must be determined with reference to these definitions.

Second, *Wilshire* and *Cose* bear upon Defendant's main argument on this subject. Defendant asserts that merely because petroleum was the source of the phenols and cresols in the caustic, caustic falls within the petroleum exclusion. Def.'s Opp'n at 14 (Doc. # 39). This argument was rejected by the Ninth Circuit in both *Wilshire* and *Cose.* The *Wilshire* court noted that releases of benzene, toluene, lead, and other materials indigenous to petroleum (but not "fractions"

---

4. The parties also dispute whether the caustic was a "feedstock." *E.g.,* Def.'s Summ.J.Mot. at 14 (Doc. # 90); Pl.'s Reply at 10 (Doc. # 97). This issue is intimately bound up with the reclamation issue, and we thus consider it in that context.

5. The implication of these cases is that determining whether caustic is within the petroleum exclusion is purely a question of law; i.e., a matter of statutory interpretation. As discussed above, though, no courts have ruled on whether phenolic caustic falls within the petroleum exclusion, and this issue is therefore arguably one of first impression.

of crude oil) are covered by CERCLA when they are released via non-petroleum chemical waste spills. *Wilshire,* 881 F.2d at 805. On the other hand, if a fraction of crude oil is released, the fact that one of its constituents is a listed hazardous substance does not create CERCLA liability for the release of that fraction. *Id.* at 804–05 (construing the § 9601(14) phrase "any fraction thereof which is not otherwise specifically listed").

The *Cose* court elaborated on this finding in the context of the EPA's interpretation of CERCLA. The EPA has interpreted the petroleum exclusion "to exclude from CERCLA response and liability crude oil and fractions of crude oil, including the hazardous substances, such as benzene, which are indigenous in those petroleum substances." EPA Memorandum, July 31, 1987, *cited in Cose,* 4 F.3d at 704, 707. The *Cose* court approved of this EPA interpretation, but found that crude oil tank bottoms (which contained the carcinogen Chrysene) fall outside the petroleum exclusion, in spite of the fact that Chrysene is indigenous to crude oil. *Cose,* 4 F.3d at 703–07. The *Cose* court apparently based this holding in part on the following principle:

> "If a specifically listed hazardous substance is *indigenous to petroleum* and is present *as a result of the release of petroleum,* such substance will fall within the petroleum exclusion *unless* it is present at a concentration level that exceeds the concentration level that naturally occurs in the petroleum product."

*Id.* at 704 (emphasis added in part). This test requires not only the presence of an indigenous hazardous substance, but also that the substance is present as a result of the release of petroleum.

▮ In other words, whether the petroleum exclusion applies depends both on *what* is spilled and on *how* it is spilled. In *Wilshire,* the hazardous substance at issue—lead in spilled leaded gasoline—would presumably have been outside the petroleum exclusion had it been released as a constituent of something other than petroleum (say, in the form of abandoned lead acid batteries). *Wilshire,* 881 F.2d at 805; *see Catellus,* 34 F.3d at 753 (implying that lead is a hazardous substance when it is a component of a lead acid battery). In *Cose,* the Chrysene was released as a constituent of the released crude oil tank bottoms; because the crude oil tank bottoms were not "petroleum," the Chrysene was considered an independent hazardous substance. *Cose,* 4 F.3d at 708. We see no reason not to apply this same reasoning in the instant case. Consequently, if the phenols and cresols 1) are indigenous to petroleum and 2) were present (at the Poly–Carb Site) as a result of the release of petroleum, then they fall within the petroleum exclusion unless 3) they were present at a concentration level that exceeds the concentration level that naturally occurs in the released petroleum.[6]

▮ Applying these principles to the case at hand, we find that the statutory language is clear (in light of *Cose* and *Wilshire* ) and that there is one genuine issue of material fact. Defendant argues vehemently that the phenols and cresols are indigenous to petroleum; since Plaintiff offers no rebuttal evidence, we will take this fact as true. Def.'s Opp'n at 14 (Doc. # 39); Def.'s Summ.J.Mot. at 22 (Doc. # 90). Plaintiff's On–Site Coordinator states that phenol soil concentration was up to (i.e., at most) 2300 ppm, cresol soil concentration was up to 1480 ppm, and concentrations of these substances in the caustic were 18,000 ppm and 14,000 ppm, respectively; since Defendant offers no rebuttal evidence, we will likewise take this fact as true. Mandel Decl. at ¶ 9 (Doc. # 33, Ex. A). The only fact left to find, therefore, is whether caustic—i.e., the mixture, not the phenols and cresols alone—is "petroleum, including crude oil or any fraction thereof," within the meanings of "petroleum" and "fraction" judicially noticed by the Ninth Circuit in *Wilshire* and *Cose.*

The parties have not briefed this issue with

---

**6.** Since the petroleum exclusion does not appear as one of the § 9607(b) affirmative defenses, and since there is no other language in § 9601(14) supporting a contrary interpretation, we hold that Plaintiff bears the burden of persuading us that the petroleum exclusion does not apply. *See Cose,* 4 F.3d at 704.

this single question in mind.[7] Our resultant doubt regarding the (one) material fact bearing on the petroleum exclusion therefore rises far beyond the level of a "genuine issue." Summary judgment for either side would therefore be totally inappropriate on this question.

### b. Reclamation and Characterization

 As discussed above, the question here is simply whether the caustic was being reclaimed; in other words, whether it was being processed to recover a usable product, or regenerated. Appellate Memorandum at 2 (Doc. # 65). Under 40 C.F.R. § 261.2(c), materials are generally solid wastes if they are recycled. 40 C.F.R. § 261.2(e)(1)(i) provides an exception, though, for materials recycled through use as ingredients in an industrial process to make a product, "provided the materials are not being reclaimed." If the materials are not being reclaimed, then they are not solid waste; if they are being reclaimed, then they *may* be solid waste. They are solid waste if reclaimed *and* they are "spent," listed sludges, listed by-products, or scrap metal; they are not solid waste if reclaimed *and* they are "unlisted" sludges, "unlisted" by-products, or listed commercial chemical products. 40 C.F.R. § 261.2(c)(3).[8]

In simple terms, Plaintiff must show that the caustic 1) was being reclaimed *and* 2) was spent, was a listed sludge, or was a listed by-product, in order to win at summary judgment.[9] Defendant, on the other hand, must show that the caustic 1) was not being reclaimed *or* 2) was a sludge exhibiting a characteristic of hazardous waste, was a by-product exhibiting a characteristic of hazardous waste, or was a listed commercial chemical product.[10] In other words, our finding as to the remanded "reclamation" issue requires an analysis similar to our petroleum exclusion analysis: we must determine both *what* the substance was (i.e., spent, by-product,

etc.) and *how* it was being processed (i.e., reclaimed or "merely" recycled through use as an ingredient). Although we have previously categorized the "reclamation" argument separately from the "spent" and "by-product" arguments, for purposes of analyzing the Ninth Circuit mandate, clearly all these arguments are inseparable. We therefore discuss them together.

Genuine issues of material fact exist as to all of these questions, for the simple reason that we cannot determine precisely what was spilled. Plainly, a "substance containing phenols and cresols had come to be located at the Poly–Carb site, both in the soil and in storage tanks." Mandel Decl. at ¶ 8 (Doc. # 33, Ex. A). Poly–Carb thought it had purchased a mixture of water, sodium phenolate, creosol, and sodium hydroxide. Poly–Carb Letter at ¶ E (Doc. # 39, Ex. F). Dexter Busby thinks the spilled liquid was composed of sodium hydroxide, sodium hydrosulfite, sodium sulfides, phenols, phenolics, naphthalenic acids, cresols, and cresolic acids. Busby Dep. at 25 (Doc. # 90, Ex. D). "Cresolic" acid may or may not be the same as "cresylic" acid, which is a "homolog" of phenol. Busby Dep. at Ex. A (Doc. # 90, Ex. D). C. Michael Wilwerding seems to think that the liquid was wholly sodium phenolate. Wilwerding Decl. at ¶ 6 (Doc. # 114). The chemist who analyzed the liquid indicates that 20% was actually fuel oil, and the remainder contained phenol, "o-cresol," and "p-cresol." Miller Letter (Doc. # 33, Ex. I). MRC's expert characterizes the liquid as a "feedstock," and not a solid waste. Griffin Decl. at 10 (Doc. # 34). Plaintiff's expert, not surprisingly, characterizes the liquid as "spent," and therefore a solid waste. Kidwell Decl. at ¶¶ 8–11 (Doc. # 89, Ex. C).

---

7. For example, Defendant argues primarily that the phenols and cresols, merely because their source was petroleum, must be within the petroleum exclusion. Def.'s Opp'n at 14 (Doc. # 39). But this argument was explicitly rejected by the *Wilshire* and *Cose* courts, as discussed above. Plaintiff, by contrast, states that caustic is not "petroleum," but offers no *evidence* backing up this assertion. Pl.'s Opp'n at 13 (Doc. # 93).

8. We apply current EPA regulations because that is what the Ninth Circuit did and that is what *Catellus* requires. Appellate Memorandum at 2 (Doc. # 65); *Catellus,* 34 F.3d at 751.

9. Caustic is plainly not a scrap metal.

10. Plaintiff, of course, bears the ultimate burden of persuasion.

We simply do not know what to make of all this. It may be that some declarants are mistaken or are just not speaking precisely. On the other hand, maybe all this facially inconsistent data is reconcilable. In any event, this Court definitely needs more solid evidence, or formal testimony, before we are willing to say exactly what was in Poly–Carb's tanks, and if we cannot say what was in those tanks, we likewise cannot say whether it was "spent," a "by-product," a "feedstock,"[11] or "being reclaimed." Summary judgment is not appropriate.

### E. Defenses

#### 1. Statute of Limitations

■ CERCLA has a three year statute of limitations, which begins running after the completion of the EPA's removal action.[12] 42 U.S.C. § 9613(g)(2)(A). It is undisputed that Plaintiff filed suit August 15, 1991. Def.'s Opp'n at 19 (Doc. # 95). It is also undisputed that Plaintiff "closed out" the Poly–Carb Site on August 17, 1988, within three years of the commencement of this action. Mandel Decl. at ¶ 18 (Doc. # 33, Ex. A). The question, then, is purely a matter of law: is "closing out" a site equivalent to "completion of a removal action"?

This, too, is a question of first impression in the Ninth Circuit and throughout the nation. Indeed, we can find only one appellate case construing § 9613(g)(2)(A) in any manner whatsoever: *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836 (6th Cir.1994).

In *Kelley*, the Michigan Department of Natural Resources hired two contractors in succession to clean up a landfill. *Id.* at 838–39. After the first contractor completed its removal efforts, the state conducted a study, determined further efforts were needed, and hired a second contractor, which started its own removal activity. *Id.* The defendants argued that the statute of limitations had run on the first removal action, since it was a separate, discrete job and the state waited until more than three years had passed before suing for recovery. *Id.* The Sixth Circuit rejected this position, largely because CERCLA's remedial purpose militates for a broad interpretation of the term "removal action."[13] *Id.* at 843; *see generally* Blake A. Watson, *Liberal Construction of CERCLA Under the Remedial Purpose Canon: Have the Lower Courts Taken a Good Thing Too Far?*, 20 Harv.Envtl.L.Rev. 199 (1996). In particular, "CERCLA has two overriding objectives—cleaning up hazardous waste, and doing so at the expense of those who created it, ... [and] [i]t is simply inconsistent with these 'essential purposes' ... to require suit on each arguably independent removal activity." *Kelley*, 17 F.3d at 843 (citation omitted). "While there may be cases where the EPA or a state might be tempted to revive a dead cause of action by instituting new removal activity," that was not the case in *Kelley* and it is not the case here. *Id.* at 844.

Within the Ninth Circuit, only one reported case has grappled with this issue.[14] In

---

**11.** Defendant urges us to characterize its caustic as a "feedstock," within the meaning of the EPA's Proposed Rule, 60 Fed.Reg. 57,747, 57,770 (1995) (to be codified at 40 C.F.R. § 261.4(a)(14)). Def.'s Summ.J.Mot. at 15 (Doc. # 90). In this proposed rule, the EPA may be characterizing as a "feedstock" caustic processed in the manner contemplated by Mr. Wilwerding; this interpretation of 60 Fed.Reg. 57,770 is disputed by Plaintiff. Pl.'s Opp'n at 5 (Doc. # 93). In any event, the proposed rule is just that, a proposed rule, and the EPA's opinion therefore has only persuasive value, akin to the other expert testimony we anticipate hearing at the trial on the merits.

**12.** We have characterized Plaintiff's activities at the Poly–Carb Site as a "removal" action, rather than a "remedial" action, based on the EPA's self-description. EPA Report at 5 (Doc. # 33, Ex. A, Att. 1). Although this characterization

affects the statute of limitations period, the effect in this case is negligible; even if we were to find the EPA's action to be "remedial," it did not start before November 1985, and thus the six-year "remedial action" statute of limitations could not have run out until November 1991. 42 U.S.C. § 9613(g)(2)(B) (statute of limitations begins to run at *start* of remedial action); EPA Report at 15 (Doc. # 33, Ex. A, Att. 1).

**13.** Additionally, although the EPA had published rulings interpreting the statute of limitations, the court found them unpersuasive. *Kelley*, 17 F.3d at 842. Neither party has directed our attention to any EPA rulings bearing on the instant case.

**14.** One other case, *Catellus Development Corp. v. L.D. McFarland Co.*, 910 F.Supp. 1509, 1515, 1519 (D.Or.1995), does not quite reach the issue at hand, since the parties apparently agreed that the removal action in question had not been "completed" at the time the suit was filed.

*California v. Celtor Chemical Corp.*, the court employed straightforward statutory interpretation to find that the removal action in question was not complete until the EPA issued its Record of Decision, almost two years after the initial stage of on-site cleanup was finished. 901 F.Supp. 1481, 1488 (N.D.Cal.1995). In addition, the court noted that the CERCLA statute of limitations should be interpreted liberally in favor of the government. *Id.* (citing *U.S. v. United Nuclear Corp.*, 814 F.Supp. 1552, 1561 (D.N.M. 1992)). We can find no Record of Decision in the instant case; nonetheless, *Celtor Chemical* stands for the proposition that a removal action is not necessarily complete simply because no more contamination exists in the soil of a CERCLA site.

We have examined CERCLA's statute of limitations (with the teachings of *Kelley* and *Celtor Chemical* in mind) and find that the statutory language is clear. The starting point for statutory interpretation is the language of the statute itself. *U.S. v. Gomez–Rodriguez*, 96 F.3d 1262, 1264 (9th Cir.1996). If the plain meaning of a statute is clear, we must give effect to the unambiguously expressed intent of Congress. *Id.* Unless otherwise defined, statutory words should be interpreted as taking their ordinary, contemporary, common meaning. *Wilshire*, 881 F.2d at 803–04 (citing *Perrin v. U.S.*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)). Following the lead of the Ninth Circuit in *Cose* and *Wilshire*, we look to the dictionary and define "complete" as "brought to an end or to a final or intended condition."

*Webster's Third New International Dictionary Unabridged* (1976). "Removal" includes

such actions as may be necessary to monitor, assess, and evaluate the release ... of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment.

42 U.S.C. § 9601(23). "Closing out," in this case, includes off-shipment of drums of spent granular activated carbon, backfilling of the soil treatment area, removal of above ground plumbing and pumps, disconnection of site electrical power, and securing of groundwater monitoring wells. EPA Report at 12 (Doc. # 33, Ex. A, Att. 1).

The question, then, is whether "closing out" constitutes "completion" of the Poly–Carb Site "removal action." We find that no reasonable jury could answer this question in the negative. Completion of a removal action means bringing "to a final or intended condition" the taking of actions "to prevent, minimize, or mitigate damage to the public health or welfare or to the environment." It can hardly be disputed that off-shipment of contaminated material and securing of monitoring wells in particular, and backfilling of soil and removal of equipment and electrical power as well, are the final activities necessary to bring the site of a removal action such as this to a "final or intended condition." [15] Accordingly, Plaintiff filed this action before the statute of limitations ran.[16]

---

**15.** Defendant urges us to apply the principle that a "removal action is completed when all contamination has been removed from the property," a principle purportedly gleaned from several district court cases. Def.'s Opp'n at 19 (Doc. # 95). Our interpretation of § 9613 leads us to a less restricted definition of "completion of a removal action," as discussed above. Moreover, even if we were to adopt such a rule (and we are not persuaded that all the cited cases actually do stand for such a rule), we believe that off-shipment of contaminated activated carbon falls within the definition of "contamination ... removed from the property," and that therefore Defendant's proposed rule supports a holding in Plaintiff's favor. *Hillsborough County v. A & E Road Oiling Service*, 853 F.Supp. 1402, 1412 (M.D.Fla.1994) (statute of limitations starts to run when all contamination is removed); *One Wheeler Road Associates v. Foxboro Co.*, 843 F.Supp. 792, 795 (D.Mass.1994) (statute of limitations starts to run only after all removal actions are complete); *Kelley v. E.I. DuPont de Nemours and Co.*, 786 F.Supp. 1268, 1278 (E.D.Mich. 1992), *aff'd*, 17 F.3d 836 (6th Cir.1994). *Cf. U.S. v. Rohm and Haas Co.*, 2 F.3d 1265, 1275–78 (3rd Cir.1993) (reversing trial court's ruling (that statute of limitations starts running when all contamination has been removed) on the grounds that contamination removal by a private party, as directed by the EPA, is not a "removal action").

**16.** We note in passing that the vast bulk of the expense and activity associated with the cleanup of the Poly–Carb Site was incurred after the passage of the legislation creating the three-year statute of limitations. *See generally* Susan M. Cooke, *The Law of Hazardous Waste*

### 2. Act of God Defense

■ Under this defense, the defendant must establish that the release was caused solely by an act of God. 42 U.S.C. § 9607(b)(1). Defendant argues that in late 1985 or early 1986 a windstorm blew down a building on the Poly–Carb Site and caused an additional release of substance, citing Frederick Schacht's deposition. Def.'s Opp'n at 37 (Doc. # 39). This is not what Schacht stated in his deposition, however; he stated only that some buildings had blown down, not that there was any release of caustic. Schacht Dep. at 13–14 (Doc. # 37, Ex. B). Had there been any caustic to spill at the time of the windstorm, it would be reasonable to infer that a severe windstorm might knock over containers of caustic, thus spilling additional material. But there is no evidence that the items which fell in the windstorm were caustic containers, or that any additional caustic spilled. Schacht's deposition is the only evidence Defendant offers for its act of God defense, and it is insufficient to raise a genuine issue of material fact as to whether an act of God caused any release.

### 3. Act of Third Party

■ The undisputed evidence indicates that the release may very well have been caused by vandals. Wilwerding Decl. at ¶ 16 (Doc. # 97, Ex. A). Defendant therefore claims the "Act of a Third Party" affirmative defense, which requires 1) that the release was caused solely by a third party, 2) that the defendant exercised due care, and 3) that the defendant took precautions against foreseeable acts by the third party. 42 U.S.C. § 9607(b)(3). The third party cannot be an employee or agent of the defendant, and the relevant act or omission cannot occur in connection with a contractual relationship with the defendant. *Id.* This statutory provision, too, is one the Ninth Circuit has never construed, so we must cobble together a legal standard from the reported cases in other Circuits.

■ There are genuine issues of material fact, as to all three elements of this defense, that preclude summary judgment. First, although the undisputed evidence tends to show that the Poly–Carb spill was the result of an intentional act, the perpetrator is completely unknown. Dinsmore Dep. at 19–20 (Doc. # 39, Ex. E); Wilwerding Decl. at ¶ 16 (Doc. # 97, Ex. A). We therefore cannot tell, based on the evidence before this Court, either how the spill occurred or who caused it. As for how the spill occurred, we adopt the Second Circuit's relevant legal standard: the act or omission resulting in liability must not occur in a such a way that there is a connection between the act and the contractual relationship. *Westwood Pharmaceuticals v. National Fuel Gas Dist.*, 964 F.2d 85, 89 (2d Cir.1992); *Shapiro v. Alexanderson,* 743 F.Supp. 268, 271 (W.D.N.Y.1990). Although it is unlikely that the spill occurred as a result of an act "connected with" the MRC–Poly–Carb contractual relationship, it is possible that, say, a Poly–Carb employee drew a sample of caustic for testing purposes and negligently left open the tap to the caustic container. We simply cannot say at this juncture that the spill did or did not occur "in connection with" a contractual relationship. Indeed, the relationship Poly–Carb and MRC had may not have been "contractual" at all.

■ As for the "sole cause" requirement, there is little case law on the subject, although it is clear that causation is not an element of the plaintiff's case. *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 265 (3rd Cir.1992) (sole cause is a very high standard, since CERCLA does not require plaintiff to prove causation). We adopt the customary legal principle: "but for" causation. In other words, if the spill would not have happened but for Defendant's sale of caustic to Poly–Carb, then an intervening third party act will not exonerate Defendant. In the context of CERCLA's strict liability, though, the case law indicates that causation may simply be a matter of foreseeability—an arranger is liable despite the intervening acts of third parties, so long as those intervening acts are foreseeable. *G.J. Leasing Co., Inc. v. Union Electric Co.*, 54 F.3d 379, 385 (7th Cir.1995) ("It seems to us very odd, even in Superfund

§ 14.01(8)(c)(ii)(F) (1996). As a result, the retroactivity of this legislation, a question that is also one of first impression in this Circuit, is thankfully not implicated here.

Cloudcuckooland, to attribute the negligent, unforeseeable conduct of the buyer's agents to the seller."). If foreseeability is in fact the touchstone of sole causation, then a third party act which is unforeseeable breaks the chain of causation. Because we lack enough information to assess foreseeability, we cannot say whether a third party was the sole cause of the Poly–Carb spill.

Defendant bears the burden of producing evidence (at the summary judgment stage) that a third party was the sole cause and that this third party had no "relationship" with Defendant within the meaning of § 9607(b)(3). *U.S. v. Monsanto*, 858 F.2d 160, 169 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Defendant's only pertinent evidence is that neither Mr. Wilwerding nor the Wells, Nevada police chief have any idea how the caustic got spilled.[17] Wilwerding Decl. at ¶ 16 (Doc. # 97, Ex. A); Dinsmore Dep. at 19–20 (Doc. # 39, Ex. E). This evidence would likely be insufficient to prove a third party affirmative defense at trial. Nonetheless, this same evidence raises the likelihood that the spill was caused by the intervening acts of a third party, and lowers the likelihood that it was in any sense "in connection with" a contract between Defendant and Poly–Carb, to the point where a genuine issue of material fact exists.

■ The same is true of the other two elements, but for a different reason. We adopt the Seventh Circuit's phrasing of the "due care" requirement. *Kerr–McGee Chemical v. Lefton Iron & Metal*, 14 F.3d 321, 325 (7th Cir.1994). Defendant must show that "it took necessary steps to prevent foreseeable adverse consequences arising from" its sale of caustic to Poly–Carb. *Idylwoods Associates v. Mader Capital*, 915 F.Supp. 1290, 1300 (W.D.N.Y.1996) (citing *id.*). Because we do not know what exactly was spilled, as discussed above, we cannot say what "care" is "due" for such a material; that is, what "steps" were "necessary." Part III.D.2.b.

Nor can we say what acts or omissions arising from Defendant's "sale" of caustic to Poly–Carb were foreseeable. For example, Defendant may have been willfully blind to the consequences of its sale, since it made little effort to check Mr. Wilwerding's background. *Westfarm Associates v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 682 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996) (CERCLA does not sanction willful or negligent blindness); Def.'s Opp'n at 36 (Doc. # 39). On the other hand, we doubt that an act of pure vandalism would be foreseeable, unless Poly–Carb or MRC had some reason to think that vandalism was likely under the circumstances. *G.J. Leasing Co.*, 54 F.3d at 385. We likewise cannot say that Defendant meets the Second Circuit's standard for reasonable precautions: that it took all precautions with respect to foreseeable acts that a "similarly reasonable and prudent person would have taken in light of all relevant facts and circumstances." *State of New York v. Lashins Arcade Co.*, 91 F.3d 353, 361 (2d Cir.1996). We simply do not know all relevant facts and circumstances. As with the first element, the evidence Defendant has produced as to the second and third elements is probably insufficient to avoid liability at trial, but it is sufficient to survive Plaintiff's summary judgment motion.

### 4. Combination Defense

■ Defendant also claims a "combination" affirmative defense, under 42 U.S.C. § 9607(b)(4), allowing the combination of, in this case, acts of God and any number of acts of third parties. Answer at 17 (Doc. # 17). We reject the act of God defense standing alone, but the lack of evidence bearing on *how* the caustic was spilled on May 27, 1985 raises a genuine issue of material fact as to whether one or several third parties were the sole cause of the spill, either alone or in combination with an act of God. Accordingly, summary judgment on this issue is inappropriate.

---

**17.** We note that the excerpt of Mr. Wilwerding's deposition filed with the Court, which was prepared and submitted by Defendant, contains no reference to how the spill may have occurred. Wilwerding Dep. (Doc. # 110, Ex. A). We draw no inferences from this omission, other than to bolster our conclusion that a genuine issue of material fact exists.

### IV. Rule 56(d) and Summary

This case involves several issues of first impression. That, plus the head-pounding complexity of the EPA's hazardous waste regulations, necessitates a summary of our findings. Moreover, because we have considerably narrowed the material issues of fact we find that "[u]pon the trial of the action the facts [herein] specified shall be deemed established, and the trial shall be conducted accordingly." Fed.R.Civ.P. 56(d). That is, Rule 56(d) allows us to limit the trial (and further dispositive motions) to factual issues which are genuinely disputed. *Seattle Audubon Society v. Espy,* 998 F.2d 699, 705 (9th Cir.1993); *Digidyne Corp. v. Data General Corp.,* 734 F.2d 1336, 1338 (9th Cir.1984), *cert. denied,* 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985).

The material facts which "exist without substantial controversy" are as follows:

A. The Poly–Carb Site was a "facility" within the meaning of CERCLA. Part III.A.

B. There was a release of hazardous substances at the Poly–Carb Site, unless these hazardous substances fall within CERCLA's petroleum exclusion. Part III.B.

C. Plaintiff incurred response costs related to the cleanup of the released hazardous substances. Part III.C.

D. Phenols and cresols are indigenous to petroleum. Part III.D.2.a.

E. Phenols and cresols were present at the Poly–Carb Site at a concentration less than that found in caustic. Part III.D.2.a.

F. Caustic is not a scrap metal. Part III.D.2.b.

G. Plaintiff filed suit before the statute of limitations ran. Part III.E.1.

H. An act of God did not alone cause any release. Part III.E.2.

The material facts which are genuinely controverted, and which must be determined either through further dispositive motions or at trial, are as follows:

A. Whether the released material is subject to CERCLA liability.

1. Whether the caustic is "petroleum, including crude oil or any fraction thereof." Part III.D.2.a.

2. Whether Defendant arranged for disposal or treatment of waste.

a. Whether the caustic was being reclaimed; i.e., whether it was being processed to recover a useful product, or regenerated. Part III.D.2.b.

b. Whether the caustic was a waste even if reclaimed.

i. Whether the caustic was spent, or a listed sludge, or a listed by-product. Part III.D.2.b.

ii. Whether the caustic was a sludge or by-product exhibiting a characteristic of hazardous waste, or a listed commercial chemical product. Part III.D.2.b.

B. Whether an act of God and/or an act of a third party caused the release.

1. What combination, if any, of acts of God and of third parties were the sole cause of the release. Part III.E.4.

2. If third parties contributed to the release, whether this exonerates Defendant from liability.

a. Whether the third parties had any relationship with Defendant. Part III.E.3.

b. Whether Defendant acted with due care. Part III.E.3.

c. Whether Defendant took precautions against foreseeable acts. Part III.E.3.

C. All facts having to do with the size of Defendant's liability, if any; i.e., the amount of cost recovery.

*IT IS, THEREFORE, HEREBY ORDERED THAT* Plaintiff's renewed motion for partial summary judgment (Doc. # 88) is **GRANTED IN PART,** in that we hereby deem certain material facts to be established, as discussed in this Order.

*IT IS FURTHER ORDERED THAT* Defendant's renewed motion for summary judgment (Doc. # 90) is **DENIED.**

*IT IS FURTHER ORDERED THAT* further proceedings in this case shall be limited

to those disputed issues outlined in Part IV above and discussed in this Order.