PHYSICIAN CARE, P.C., a Michigan professional corporation, and Bruce A. Margulis, an individual, Plaintiffs and Counter–Defendants,

v.

CAREMARK, INC., a California corporation, Defendant and Counter–Plaintiff.

CAREMARK, INC., a California corporation, Plaintiff,

v.

PHYSICIAN CARE, P.C., a Michigan professional corporation, and Bruce A. Margulis, an individual, Defendants.

Nos. 96–70039, 96–73598.

United States District Court, E.D. Michigan, Southern Division.

Aug. 20, 1998.

Jeffrey G. Heuer and Susan S. Lichterman, Detroit, MI, for plaintiff.

Michael J. Lavoie, Detroit, Howard M. Pearl, Chicago, IL, for defendant.

## MEMORANDUM OPINION & ORDER

GILMORE, District Judge.

### I.

The present case, which has been before this Court on several prior motions, is basically about a joint business enterprise gone very wrong. The facts follow.

### A.

Dr. Bruce Margulis ("Margulis") is the sole shareholder, sole officer, and sole director of Physician Care, P.C. ("Physician Care"), a Michigan professional corporation. In the 1980s, Physician Care formed two Michigan general partnerships in conjunction with Caremark, Inc. ("Caremark"), a California corporation. The partnerships were known as: (1) Home Infusion Resources ("HIR Partnership") and (2) Physician Health Resources ("PHR Partnership")(jointly, the "Partnerships"). The business purpose of the Partnerships was to provide in-home medical supplies and care (i.e., home infusion services) in the state of Michigan. Physician Care was responsible for marketing and supervising the home infusion services. Caremark, on the other hand, was responsible for the Partnerships' billing and administrative activities. Caremark's responsibilities included making payments to participating physicians, who were paid on a fee-for-service basis.

In 1986, Caremark entered into a Prescription Drug Program Agreement ("Prescription Agreement") with Blue Cross Blue Shield of Michigan ("BCBSM"). The Prescription Agreement governed the Partnerships' claims for pharmaceutical reimbursement for its BCBSM-insured clients. Under its terms, Caremark was to submit claims for pharmaceutical reimbursement at "net acquisition cost."

### B.

On April 1, 1991, Physician Care and Caremark entered into an agreement under which Physician Care sold its interest in the HIR Partnership to Caremark ("HIR Purchase Agreement").[1] The PHR Partnership,[2] however, remained in existence until December 30, 1992, when the parties executed three agreements: (1) a Partnership Retirement Agreement ("PHR Retirement Agreement"); (2) an Employment Agreement ("Employment Agreement"); and (3) a Non–Competition Covenant ("Non–Competition Covenant"). Under the PHR Retirement Agreement, Physician Care agreed to retire from the PHR Partnership and Margulis agreed to retire as its President. However, under the Employment Agreement, Margulis and Caremark agreed that Margulis would work for five years beginning January 1, 1993, as Caremark's Director of Marketing of home infusion services in Michigan. In this capacity, Margulis was to earn an annual salary of $100,000, plus an annual award of 28,829 shares of Caremark stock. While Caremark reserved the right to terminate Margulis during the five-year term, the Employment Agreement provided that if such termination was without cause, the balance of Margulis' salary and stock awards for the five-year term would immediately vest. Finally, under the Non–Competition Covenant, Caremark was to pay Physician Care $50,000 per year for five years not to compete with Caremark. Similarly, Caremark was to pay Margulis $586,022.20 per year for five years not to compete with Caremark.

---

1. Physician Care owned a fifty percent (50%) interest in the HIR Partnership.

2. Physician Care owned a twenty-two percent (22%) interest in the PHR Partnership in 1991, and a twenty-one percent (21%) interest in 1992.

In April 1995, over two years after the dissolution of the PHR Partnership, Caremark sold its home infusion business to Coram Health Care Corporation ("Coram"). It then entered into negotiations to terminate the Employment Agreement with Margulis, as his skills in marketing and supervising home infusion services were no longer required. However, as described below, those negotiations never came to fruition.

## C.

In 1991, prior to the dissolution of the Partnerships, the Office of Inspector General ("OIG") of the United States Department of Health and Human Services began a criminal investigation of Caremark's health care enterprises nationwide, including the HIR and PHR Partnerships in Michigan.[3] As part of this investigation, the OIG investigated whether Caremark's fee-for-service system disguised an elaborate kick-back scheme by which physicians were paid for patient referrals. In addition, it investigated whether Caremark, and the HIR and PHR Partnerships in particular, were seeking pharmaceutical reimbursement from BCBSM at "average wholesale price" rather than net acquisition cost, as required under the Prescription Agreement.[4]

As a result of the OIG investigation, on June 15, 1995, Caremark pled guilty to two counts of mail fraud pursuant to a Rule 11 plea agreement. One count was brought by Information in the District of Minnesota and the second was brought by Information in the Southern District of Ohio.[5] In the combined Plea Agreement ("Caremark Plea"),[6] Caremark admitted making payments to doctors—under the guise of consulting agreements, research grants, joint venture and partnership agreements, supply agreements, marketing agreements, and professional services agreements—for and to induce patient referrals. It also pled guilty to defrauding the Federal Employees Health Benefits Program ("FEHBP") and the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), to which it had submitted bills for the treatment of the illegally referred patients. Pursuant to Caremark's Rule 11 plea agreement, Caremark paid $29 million in fines, $132 in civil penalties, and an additional $2 million to the Health Resources and Services Administration ("HRSA"). In exchange, Caremark received immunity from further prosecution for related wrongdoing nationwide. It is of particular relevance to the case at hand that in Attachment A to Caremark's Rule 11 plea agreement, Caremark specifically received immunity from prosecution for the "related offense" of its manner of billing BCBSM.

It is important to note that while Caremark received immunity from prosecution for its billing practices, this immunity did not extend to Physician Care or Margulis. Rather, under Caremark's Rule 11 plea agreement, the government expressly preserved its right to prosecute Caremark's partners, employees, and physicians. In addition, Caremark agreed to cooperate with the ongoing OIG investigation.

## D.

Margulis claims that the entry of the Caremark Plea effectively ended an agreement between Caremark and Physician Care to respond cooperatively to the OIG investigation and to jointly defend the legality of their

---

3. The parties agree that this investigation arose in the context of a far-reaching examination of the health care industry by the OIG, the United States Department of Justice ("DOJ"), and the Attorneys General of the fifty states.

4. Caremark argues that its dispute with BCBSM over the proper billing method was a commonplace "civil business dispute," not a criminal matter. In support of this, it argues that the evidence demonstrates that its practice of seeking reimbursement at average wholesale price was not concealed, but open and obvious. Margulis contests this claim, arguing that Caremark did not admit its practice of seeking reimbursement at average wholesale price until after the OIG investigation was underway.

5. The Information in Ohio listed among the offenses an agreement with a doctor in Saginaw, Michigan. Margulis points out that that particular agreement had been negotiated by Margulis and administered by the PHR Partnership.

6. Hereinafter, the "Caremark Plea" refers to the Plea itself, as well as Caremark's Rule 11 plea agreement and any statements, negotiations, and publicity related to the Caremark Plea.

business practices. Given the fact that Caremark's Rule 11 plea agreement did not extend immunity to Physician Care, Margulis states that he was left with "no choice" but to negotiate and authorize a Rule 11 plea agreement for Physician Care.

On August 10, 1995, Physician Care notified Caremark that it was negotiating a plea agreement with the United States Attorney for the Eastern District of Michigan. In addition, it notified Caremark that it was also negotiating a settlement agreement with BCBSM. Following a series of inquiries by Caremark, the essential elements of the proposed agreements were communicated to Caremark in a letter of September 22, 1995. Specifically, Physician Care informed Caremark that

negotiations for a potential corporate plea for Physician Care ... are underway .... Generally, we can advise Caremark that the plea appears to involve net acquisition cost, a civil settlement in the range of [$1.1 million] with [BCBSM] and a fine of approximately $200,000. Any settlement with the federal government or [BCBSM] would expressly disclaim any binding effect on Caremark. The full amount of any settlement with [BCBSM] would be deducted from any amounts owed by Caremark to [BCBSM] under any future settlement of claims between these parties.

On November 16, 1998, an Information was filed in the Eastern District of Michigan, charging Physician Care with one count of mail fraud. It provided that Caremark, which "handle[d] all billings" for PHR, had "submitted invoices to [BCBSM] based on average wholesale price instead of net acquisition cost[, which] increased the costs to [BCBSM]." Physician Care was charged only with "knowingly and willfully shar[ing] in the profits from this scheme to defraud," rather than carrying out the scheme itself. As such, the language of the Information clearly implicates Caremark as the primary wrongdoer.

On November 28, 1995, the final drafts of Physician Care's Rule 11 plea agreement and settlement agreement were telefaxed to Caremark. Under the terms of the settlement agreement with BCBSM ("Physician Care Settlement Agreement"), Physician Care was to pay BCBSM $1.1 million but would expressly refuse to admit wrongdoing. In addition, Physician Care was to "expressly disclaim any authority or ability to speak for or bind Caremark, PHR and HIR." Rather, the Settlement Agreement was to specifically acknowledge

that BCBSM is engaged in ongoing discussions with Caremark concerning overbilling issues and that nothing in this Agreement shall affect any claims or defenses which BCBSM has against Caremark or Caremark has against BCBSM provided only that amounts paid hereunder may, to the extent appropriate, be a credit against any liability of Caremark to BCBSM for overbilling during the periods in question.

Under the terms of Physician Care's Rule 11 plea agreement, the government was to grant Physician Care immunity from further prosecution. It also extended immunity from prosecution to Physician Care's officers "for activities known to the government or related to or arising out of Physician Care's or its officer's relationship with Caremark, [PHR], [HIR], or their relationships with third parties." As such, while Margulis was not specifically named in the Rule 11 plea agreement, by its terms he was to receive immunity from prosecution for all activities related to the Partnerships. Physician Care, on the other hand, was to be assessed a criminal fine of $100,000. It was also to comply with the terms of its Settlement Agreement with BCBSM within 24 hours of sentencing. Thus, the Physician Care Settlement Agreement and Plea were clearly intertwined.

In a letter dated Friday, December 1, 1995, Caremark set forth its objections to Physician Care's draft agreements. The letter stated that the agreements "lack any factual and legal basis" and would therefore constitute "a breach of Dr. Margulis' fiduciary and contractual obligations to Caremark" as well as a "scheme to defraud or otherwise injure Caremark." However, the parties dispute whether the letter was received by Physician Care before the agreements were executed the following Monday morning.

That Monday—December 4, 1995—Physician Care pled *nolo contendre* to the Information filed in the Eastern District of Michigan ("Physician Care Plea")[7] and executed the Settlement Agreement with BCBSM. It is important to note that Margulis was not personally prosecuted by the government or sued by BCBSM. However, he concedes that the Physician Care Settlement Agreement and Plea were entered into upon his authorization, as the sole shareholder, officer, and director of Physician Care.

### E.

In a letter dated December 12, 1995, Caremark terminated its Employment Agreement with Margulis, effective December 27. The letter states that the termination is "with cause." Consequently, Caremark has refused to pay Margulis the balance of his salary and stock awards.

The December 12 letter set forth no specific explanation for the termination. Caremark has subsequently stated that the termination was a direct result of Margulis' authorization of the Physician Care Plea. Caremark avers that the Physician Care Plea undermined it in its own negotiations with BCBSM. Specifically, it claims that after Physician Care entered its Plea, BCBSM backtracked from an earlier-stated willingness to compromise with Caremark.

In March 1996, Caremark and BCBSM executed a $11.1 million settlement agreement ("Caremark Settlement Agreement"). The amount was then offset by the $1.1 million collected by BCBSM pursuant to the Physician Care Settlement Agreement and further reduced by an additional one percent (1%), such that Caremark paid a total of $9.9 million. Caremark contends that it would have received a much more favorable settlement with BCBSM, or indeed would have escaped liability altogether, but for the Physician Care Plea. Margulis, on the other hand, argues that the reason proffered by Caremark for his termination is mere pretext and that he was terminated simply to prevent his January 1, 1996 stock award.

### II.

On January 3, 1996, Physician Care and Margulis filed the present suit against Caremark. The Complaint, as amended, states the following six Counts:

Count I: Claim for Indemnity

Count II: Unjust Enrichment

Count III: Breach of the PHR Retirement Agreement

Count IV: Breach of the Employment Agreement

Count V: Breach of the Non–Competition Covenant

Count VI: Breach of the HIR Purchase Agreement

At a hearing on July 18, 1996, and by an Order dated July 22, 1996, this Court granted Caremark's Motion to Dismiss Counts I and II of the Complaint. Subsequently, by an Order dated September 25, 1997, this Court granted Caremark's Motion for Summary Judgment on Counts III, V, and VI. On Count IV, the Court granted Caremark's Motion for Summary Judgment to the extent that Count IV states a claim of conversion but denied the Motion to the extent that Count IV states a claim for breach of the Employment Agreement.

It is important to note that as a result of the foregoing rulings, Physician Care has been dismissed entirely from the case. The remaining disputes are between Margulis and Caremark only. More specifically, the only surviving Count in the Complaint—Count IV—is Margulis' claim for breach of the Employment Agreement. The issue presented is whether Caremark terminated Margulis with cause and according to the terms of the Employment Agreement. Caremark claims that the termination was "with cause" under Section 3(b)(ii)(B) of the Employment Agreement, for the reason that by authorizing the Physician Care Plea, Margulis "willfully engag[ed] in conduct which [was] materially injurious to Caremark, financially or otherwise."

---

**7.** Hereinafter, the "Physician Care Plea" refers to the Plea itself, as well as Physician Care's Rule 11 plea agreement and any statements, negotiations, and publicity related to the Physician Care Plea.

In a Counter–Complaint filed October 14, 1997, Caremark states two Counterclaims: (1) breach of fiduciary duty and (2) breach of the Employment Agreement. These Counterclaims are asserted against Margulis only, as Physician Care was not a party to the Employment Agreement.

In Counterclaim I, Caremark claims that Margulis breached his fiduciary duty to Caremark by

(1) caus[ing] Physician Care ... to plead *nolo contendre* ... to one count of mail fraud, relating to a scheme to defraud [BCBSM];

(2) fail[ing] to disclose [Physician Care's] misconduct in relation to ... BCBSM;

(3) refus[ing] to provide material information regarding the substance of the plea documents ..., such as that they named Caremark as a coparticipant in the scheme to defraud;

(4) refus[ing] to provide, and agree[ing] not to provide, material information regarding the status of contacts with the government or BCBSM; and

(5) fail[ing] to provide Caremark with any information on which Caremark employees he believed had acted unethically, as required by the Manual.

In Counterclaim II, Caremark alleges that Margulis breached the Employment Agreement by "(1) fail[ing] to comply with the terms of his employment ...; and (2)refusing to meet with Caremark's attorneys" during the course of his negotiations with the government and BCBSM. By an Order of February 23, 1998, Magistrate Judge Marc A. Goldman ruled that Caremark's claim for financial damages under Count II of the Counter–Complaint is limited to $9.9 million, the amount Caremark actually paid under its Settlement Agreement with BCBSM.

The parties are now before the Court on (1) Caremark's Motion *in Limine,* filed March 16, 1998, and (2) Margulis' Motion *in Limine,* filed April 27, 1998. In these Motions, Caremark and Margulis both move to exclude from evidence the respective criminal Pleas that they concede will cast their respective claims in a negative light. Caremark seeks to exclude the Caremark Plea, as well as evidence of the OIG investigation that preceded it. It argues that that evidence is irrelevant to the issues before the Court or, alternatively, that its probative value is substantially outweighed by the danger of unfair prejudice or confusion. In his Motion, Margulis argues that the Physician Care Plea must be excluded on the same grounds, relevancy and unfair prejudice. Alternatively, he argues that the Physician Care Plea must also be excluded for the reason that it was a plea of *nolo contendre,* rather than a plea of guilty.

In addressing the admissibility of the Caremark Plea and Physician Care Plea, the Court notes that it does not entertain any arguments raised by the parties as to the sufficiency of that or other evidence to support their competing factual allegations. For purposes of the present Memorandum Opinion, the sufficiency of such evidence is presumed to be adequate, and the Court merely takes up the admissibility of the challenged Pleas. The matter of the sufficiency of the evidence will be addressed in the Court's ruling on the pending Motions for Summary Judgment.

### III.

The Court turns first to Caremark's Motion *in Limine.* As stated above, Caremark seeks to exclude evidence of the Caremark Plea. As such, it also seeks to exclude evidence of any negotiations, statements, or publicity related to that Plea, as well as of the OIG investigation that preceded it.

### A.

 Caremark first argues that the Caremark Plea is irrelevant to Margulis' remaining claim.

This argument is advanced under Federal Rules of Evidence 401 and 402 ("Rule 401" and "Rule 402," respectively). Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 then simply provides that "[a]ll relevant evidence is admissible" and

that "[e]vidence which is not relevant is not admissible." *See also Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 587 (6th Cir. 1994)("Only relevant evidence may be admitted at trial.").

It is well established that the standard for determining the relevancy of evidence is "extremely liberal." *Douglass v. Eaton Corp.,* 956 F.2d 1339, 1344 (6th Cir.1992). To be relevant, evidence must simply "have some bearing on the probability of 'the existence of any fact that is of consequence to the determination of the action.'" *Black,* 15 F.3d at 587 (quoting Rule 401).

> [I]n determining whether evidence is relevant, the district court must not consider the weight or sufficiency of the evidence. Even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has *even the slightest* probative worth.

*Douglass,* 956 F.2d at 1344 (citing 21 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure,* § 5165 (1977)) (emphasis added).

Margulis' sole remaining cause of action is for breach of the Employment Agreement. Specifically, Margulis claims that his termination from Caremark was without cause and that Caremark thus breached the Employment Agreement by failing to pay the balance of his salary and stock awards. He reminds the Court that by the time of his termination, Caremark had sold its home infusion business to Coram and therefore no longer required his services under the Employment Agreement. Margulis argues that Caremark's reference to the Physician Care Plea is mere pretext put forward for the purpose of withholding the salary and stock awards due to him under the remainder of the five-year term of the Employment Agreement.

In order to prevail on his cause of action, Margulis must defeat Caremark's counterargument that his termination was with cause, as defined in the Employment Agreement. The Employment Agreement provides, at Section 3(b)(ii)(B), that Margulis could be terminated with cause in the event that "there is willful engaging by [him] in conduct which is materially injurious to Caremark, financially or otherwise." Thus, as correctly pointed out by Margulis, in order to establish cause, Caremark must show that Margulis' conduct was both willful and materially injurious to Caremark.

Caremark claims that Margulis willfully engaged in such materially injurious conduct when he: (1) caused and authorized Physician Care to plead *nolo contendre* to an Information that identified Caremark as the primary wrongdoer in a scheme to defraud BCBSM; and (2) withheld information from Caremark regarding the initiation, progress, and content of the negotiations leading to the Physician Care Plea. It contends that there can be no serious question as to whether Margulis' conduct was willful. Furthermore, it claims that that conduct was materially injurious, in that it caused BCBSM to abandon its willingness to compromise with Caremark. Indeed, Caremark seeks damages under this claim in the exact amount of the Caremark Settlement Agreement.

In sum, in determining the relevancy of the Caremark Plea, this Court must determine whether that evidence has any tendency to make more probable or less probable the alleged fact for which Margulis seeks to introduce it. More specifically, the Court must answer the question of whether the Caremark Plea has "even the slightest probative worth" on the question of whether Margulis' authorization of the Physician Care Plea was either willful or materially injurious to Caremark. *Douglass,* 956 F.2d at 1344. The Court finds that it does.

First, the Court finds the Caremark Plea is clearly relevant to the issue of whether the Physician Care Plea was "materially injurious" to Caremark. As shown, Physician Care pled *nolo contendre* to criminal acts related to the billing of BCBSM by the Partnerships. Caremark argues that the Physician Care Plea was materially injurious to Caremark because it identified Caremark as the primary wrongdoer in a scheme to defraud BCBSM and therefore led BCBSM to offer Caremark much less favorable settlement terms. The Court agrees with Margulis that the trier of fact must be per-

mitted to know of the existence and content of the Caremark Plea in order to determine the proper weight to afford Caremark's argument. More specifically, the trier of fact must be permitted to know that pursuant to its Plea, Caremark received immunity for "related offenses" connected to the billing of BCBSM. In other words, despite Caremark's protestations to contrary,[8] Attachment A to Caremark's Rule 11 plea agreement suggests that the government had considered the Partnerships' billing of BCBSM to involve potential criminal offenses. This casts doubt upon Caremark's assertion that the Physician Care Plea transformed Caremark's negotiations with BCBSM from a commonplace "civil business dispute" into a contentious process tainted by allegations of criminal conduct.

The Court also agrees with Margulis that the Caremark Plea is relevant to the question of his state of mind at the time that he authorized the Physician Care Plea. In other words, it finds that this evidence is relevant to the issue of whether Margulis' conduct in authorizing that Plea was "willful." The Court notes that Caremark is in a poor position to dispute this finding. Caremark clearly intends to argue to the trier of fact that Physician Care's Plea left Caremark, despite its purported lack of wrongdoing, with "no choice" but to accept an unfavorable settlement with BCBSM; however, it argues at the same time that the Court should reject out of hand Margulis' argument that the Caremark Plea left him with "no choice" but to authorize the Physician Care Plea. Caremark cannot have it both ways.

In sum, the Court finds that the Caremark Plea is relevant to the issues before it.

### B.

Caremark argues next that, even if the Caremark Plea is relevant to Margulis' remaining cause of action, it must nevertheless be excluded on the grounds that its probative value is substantially outweighed by the danger of unfair prejudice or confusion.

This argument is advanced under Federal Rule of Evidence 403 ("Rule 403"). Rule 403 permits relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." " 'Unfair prejudice' means the *undue* tendency to suggest a decision based on improper considerations; it 'does not mean the damage to a defendant's case that results from [the] legitimate probative force of the evidence.' " *Doe v. Claiborne County, Tennessee,* 103 F.3d 495, 515 (6th Cir.1996)(quoting *United States v. Bonds,* 12 F.3d 540, 567 (6th Cir.1993)) (emphasis added); *Sutkiewicz v. Monroe County Sheriff,* 110 F.3d 352, 360 (6th Cir.1997)(quoting same). Indeed, "[a]ll evidence presented by a party opponent is prejudicial to the other side, to a greater or lesser degree." *Claiborne County,* 103 F.3d at 515.

Ultimately, the admission of relevant but potentially prejudicial or confusing evidence is placed within the sound discretion of the district court. *Bonds,* 12 F.3d at 554; *Hurt v. Coyne Cylinder Co.,* 956 F.2d 1319, 1328 (6th Cir.1992); *Clarksville–Montgomery County Sch. Sys. v. United States Gypsum Co.,* 925 F.2d 993, 999 (6th Cir.1991). However, courts must be cognizant that " 'where a decision to exclude evidence on the basis of Rule 403 is overly restrictive such that it precludes a plaintiff from the full opportunity to present his case to the jury, it will be deemed an abuse of discretion.' " *Sutkiewicz,* 110 F.3d at 360 (quoting *Claiborne County,* 103 F.3d at 515). Courts must also be cognizant that " 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id.* at 515 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

Caremark argues that Margulis intends to introduce the Caremark Plea not principally for the proffered reasons, but in order to "trumpet" it before the trier of fact·in a

---

**8.** Specifically, Caremark states that BCBSM was merely "mentioned in the context of Caremark's [Rule 11 plea agreement] only as a billing dis-

pute, unrelated to the substance of the [P]lea, for which Caremark would not face any criminal charges or liability." Caremark Motion, p. 4.

deliberate effort to cast Caremark in a negative light. Caremark Motion, p. 4. In response, Margulis does not deny that the Caremark Plea will be prejudicial to Caremark. Rather, he acknowledges, as he must, that evidence of a criminal guilty plea cannot be anything other than prejudicial. However, he points out that the Court may exclude such evidence only if the prejudice is unfair, and he argues that the prejudice created by the Caremark Plea is not unfair. The Court agrees.

As stated in Section III(A) above, the trier of fact must be made privy to Caremark's Rule 11 plea agreement, as it suggests that the government viewed Caremark's practices of billing BCBSM as potential criminal offenses. Again, this is necessary if the trier of fact is to be able to properly weigh Caremark's argument that the Physician Care Plea so transformed Caremark's negotiations with BCBSM so as to cause Caremark material injury. There is simply no other means to present this information to the trier of fact. It is part and parcel of the Caremark Plea.

Going further, the Court finds that to exclude the Caremark Plea would in fact work an unfairness upon Margulis. As stated, with its Plea, Caremark received immunity from prosecution for any "related offenses" pertaining to Caremark's practices of billing BCBSM. If the trier of fact is not made aware of this fact, it will be left to conclude that the Physician Care Plea exposed Caremark to prosecution for those billing practices. Despite the fact that Caremark does not claim damages as a result of exposure to prosecution, such a conclusion would unquestionably prejudice Margulis. Furthermore, that prejudice would be unfair, as the conclusion would be in error.

### C.

Based on the foregoing, the Court denies Caremark's Motion *in Limine* and admits the Caremark Plea into evidence.

### IV.

The Court turns next to Margulis' Motion *in Limine*. As stated, Margulis seeks to exclude evidence of or relating to the Physician Care Plea of *nolo contendre* to one count of mail fraud. In a manner similar to Caremark, Margulis argues that that Plea is irrelevant to Caremark's Counterclaims or, alternatively, that the probative value of that evidence is substantially outweighed by the danger of unfair prejudice or confusion. In addition, he argues that the Physician Care Plea is inadmissible for the reason that it is a plea of *nolo contendre*, rather than a plea of guilty.

### A.

Margulis first argues that the Physician Care Plea is irrelevant to Caremark's Counterclaims.

Again, the main issue remaining in this case is whether Margulis was terminated with cause.[9] Caremark argues that in order to present its case, it must be permitted to offer its version of the reason for the termination. The Court finds that this general proposition is beyond reasonable dispute. However, Margulis argues that this general proposition does not open the door to admit the Physician Care Plea into evidence, for the simple reason that that Plea was entered by Physician Care, not Margulis, and therefore cannot have been the basis for Margulis' termination. Rather, Margulis argues that Caremark's only possible purpose in introducing the Plea is to prejudice Margulis, to cause him to appear guilty by association. The Court does not agree.

It is indeed obvious and uncontested that the Physician Care Plea was entered by Physician Care, the corporation, and not by Margulis, the individual. However, this fact, standing alone, does not render the Physician Care Plea irrelevant. As stated by Caremark, the disputed evidence is being offered not with reference to a claim against Physi-

---

9. The Court again notes that Caremark states Counterclaims both for breach of the Employment Agreement and for breach of fiduciary duty. Caremark does not separate these claims in its consideration of the admissibility of the Physician Care Plea, as it recognizes that the same basic issue underlies each claim: whether Margulis willfully engaged in conduct which was materially injurious to Caremark.

cian Care but with reference to its claims against Margulis. However, Margulis argues that because Caremark has not alleged that Margulis is the alter ego of Physician Care, Caremark is barred from introducing the fact of the Physician Care Plea as evidence against him. In other words, he argues that Physician Care's conduct may not be attributed to him. This argument demonstrates a misunderstanding of—or refusal to understand—Caremark's purpose in introducing this evidence.

Caremark does not intend to show that Margulis himself entered the Physician Care Plea, but only that he authorized Physician Care to do so. In order words, the Physician Care Plea will not be offered as an example of Margulis' conduct but as evidence to support the claim that he authorized action that he knew to be materially injurious to Caremark. As such, the only action to be attributed to Margulis is the action of authorization, as well as the precedent act of negotiation. Margulis has offered no persuasive argument that this is improper. Accordingly, the Court finds the Physician Care Plea to be relevant.

### B.

Margulis then argues that, even if the Physician Care Plea is deemed relevant, it must be excluded under Rule 403 for the reason that "many lay people do not understand the concept of a corporation as a separate entity" and that the trier of fact will certainly fail to grasp the distinction between Margulis, the individual, and Physician Care, the corporation. In other words, Margulis contends that the trier of fact, once informed that Margulis is the sole shareholder, officer, and director of Physician Care, will attribute Physician Care's actions to Margulis. He argues that the trier of fact will wrongly conclude that Margulis himself pled *nolo contendre* to a criminal act.

The proper response to this argument is clear. The Court cannot sweep aside the relevant law because that law is complex. Although doing so may allow it to simplify the task before the trier of fact, it would do so at the expense of basic fairness and justice to the parties. The Court is fully competent to provide the necessary instruction on the law. It is uncontested that Margulis is a separate entity from Physician Care. This fact will certainly be emphasized by Margulis and the Court will support this emphasis with a careful and thorough instruction on the supporting law.

As a final note, it appears to the Court that Margulis also objects to the introduction of the Physician Care Plea for the reason, repeated often, that he was left with "no choice" but to authorize it. Indeed, it may ultimately be shown that Margulis found himself in a position in which his obligations as the fiduciary of Physician Care became incompatible with his obligations to Caremark, whether under the Employment Agreement or as its alleged fiduciary. That mere fact, if true, does not operate to insulate Margulis from liability for his actions, either in his individual capacity or in a fiduciary capacity. Rather, Margulis may avoid liability only by persuading the trier of fact that his authorization of the Physician Care Plea was not a willful act or, alternatively, that it was not materially injurious to Caremark. He may not do so by excluding relevant evidence.

### C.

■ Margulis raises his third and final challenge to the admissibility of the Physician Care Plea under Federal Rule of Evidence 410 ("Rule 410"). Rule 410 provides in relevant part as follows:

[E]vidence of the following is not, in any civil ... proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

. . .

(2) a plea of *nolo contendre;* [or]

(3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure ... regarding [a plea of *nolo contendre* ] ....

Relying on this Rule, Margulis argues that the Physician Care Plea is inadmissible for the reason that it was a plea of *nolo contendre,* rather than a plea of guilty.

The Sixth Circuit has clearly provided that "the plain meaning of [a] statute controls the

court's interpretation [except] in the 'rare cases'" in which either (1) the statutory language is ambiguous or (2) "'the literal application . . . will produce a result demonstrably at odds with the intentions of its drafters.'" *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 842 (6th Cir.1994)(quoting *United States v. Steele*, 933 F.2d 1313. 1317 (6th Cir.), *cert. denied*, 502 U.S. 909, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991)). Here, Margulis argues that the Physician Care Plea is not admissible as against him because he was clearly a "participant" in the discussions and negotiations which led to Physician Care's eventual entry of a plea of *nolo contendre*. However, the language of Rule 410 is clear and cannot support this argument. On its face, the protections of Rule 410 extend solely to "the defendant" in the underlying criminal case. As demonstrated by Caremark, the sentence structure of Rule 410 does not permit for an interpretation that extends to all participants in the plea negotiations. There can be no reasonable conclusion but that the disputed clause—"who . . . was a participant in the plea discussions"—is an adjective clause describing "the defendant."

Nor can it be persuasively argued that the "'the literal application [of Rule 410] will produce a result demonstrably at odds with the intentions of its drafters.'" *Kelley*, 17 F.3d at 842. As pointed out by Caremark, the Advisory Committee Notes to Rule 410 provide that the purpose of the Rule is to foster "the effectiveness of withdrawing pleas [and] the freedom of discussion" and that it is consistent with this purpose to "limit [it] to use against the accused." Thus, it is clear that Margulis, who was never named as a criminal defendant, has no standing to seek the protections of Rule 410.

In an effort to defeat this literal interpretation of Rule 410, Margulis points to *First National Bank v. First Financial of Louisiana*, 921 F.Supp. 1506 (E.D.La.1996). In *First National*, the court was confronted with the question of whether the *nolo contendre* plea of a bank officer is admissible against the bank in a civil proceeding, when the criminal and civil cases arise out of a common set of facts. The defendant argued, as Caremark argues in the present case, that

Rule 410 protects only the party who entered the *nolo contendre* plea and that the evidence of the *nolo contendre* plea was therefore admissible against the bank. *Id.* The court rejected this argument. It held that, while the bank was not the defendant who entered the *nolo contendre* plea in the criminal matter, Rule 410 applies to those civil defendants "aligned with" that criminal defendant. *Id.* It held that such civil defendants are defendants "once removed" and are entitled to the protections afforded by the Rule. *Id.*

This Court declines to follow the lead set by *First National*. As an initial and obvious matter, this Court is not bound by a ruling of a fellow district court. More importantly, this Court is wholly unpersuaded by the reasoning set forth in *First National*. While that court purported to rely on "the language of [Rule 410], its legislative history, and the policies it seeks to promote," *id.* at 1508, it in fact bypasses any examination of the language of the Rule and moves directly to the statutory history. Without having first established an ambiguity in the plain language of the Rule, the court had no basis upon which to turn to the legislative history, except to determine whether its "'literal application . . . will produce a result demonstrably at odds with the intentions of its drafters.'" *Kelley*, 17 F.3d at 842. This Court finds that the legislative history cited by the court in *First National* contains nothing to support the concept—of a defendant "once removed"—ultimately crafted by that court. Indeed, any reference to legal authority disappears at that critical point in the opinion. *Id.* Furthermore, the court utterly fails to acknowledge the Advisory Committee Note explicitly limiting the application of the Rule to the accused. *Id.*

The Court also notes that even if *First National* were persuasive, it is not directly relevant to the case at hand. In *First National*, the plaintiff sought to admit the disputed *nolo contendre* plea as evidence that the wrongdoing to which the plea pertained had occurred. In the present case, by contrast, Caremark seeks to admit the Physician Care Plea as evidence of Margulis' act of authorization and of the alleged damage to Caremark. However, Caremark does not

817

seek to prove the truth of the matters in the Information. To the contrary, it seeks to prove that the wrongdoing described therein did not occur and that Margulis had no knowledge of such wrongdoing. Thus, even if this Court were inclined to adopt the reasoning of *First National,* Margulis would not qualify as a defendant "once removed."

As a final matter, the Court points out that Margulis' argument also contradicts his own earlier arguments. In making his challenges under Rules 401, 402, and 403, Margulis repeatedly emphasizes that he is an entity wholly apart from and legally separate from Physician Care and that the Physician Care Plea is unrelated, or related only tangentially, to the question of his own liability. Here, by contrast, Margulis argues that, while he is separate from Physician Care, his interests are so closely aligned with those of Physician Care that he must be viewed as a defendant "once removed." In other words, Margulis, like Caremark, improperly seeks to have it both ways.

The Court thus denies Margulis' Motion *in Limine* and leaves Margulis to attack the Physician Care Plea with his emphasis upon the separate identity of Margulis and Physician Care.

Given the foregoing, the Court need not reach Caremark's argument that, pursuant to *Walker v. Schaeffer,* 854 F.2d 138 (6th Cir. 1988), the Physician Care Plea may be admitted for the reason that it is being admitted *in favor of* Caremark, rather than *against* Margulis. That argument is now moot.

### V.

In summation, the Court finds that both the Caremark Plea and the Physician Care Plea are clearly relevant to the issues before it and must be admitted for due consideration by the trier of fact. The specific bases for this ruling have been laid out above; however, the Court notes more generally that both of the contested Pleas are necessary elements of the history underlying this case. The parties remaining in this case were involved in a joint business enterprise and were targets of the same criminal investigation. The notion that the investigation or its outcome may be neatly extracted from the history of that enterprise is easily dismissed. To remove either the Caremark Plea or the Physician Care Plea would be to present to the trier of fact a disjointed image from which no fair or reliable impression could be formed.

Furthermore, although both Caremark and Margulis recognize and acknowledge that the Plea that each sought to exclude will cast a dark shadow over their respective cases, such considerations cannot rule the day. A stated by the Sixth Circuit in *Claiborne County,* the fact that certain evidence "logically casts [a party] in an unfavorable light is not, *ipso facto,* a reason to exclude it." 103 F.3d at 515. The challenged evidence is indispensable and a less provocative substitute is simply not available.

The Motions are denied.

**IT IS SO ORDERED.**